No. 18-1855/18-1871

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

**GARY B.; JESSIE K.,** a minor, by Yvette K., guardian ad litem; **CRISTOPHER R.,** a minor, by Escarle R., guardian ad litem; **ISAIAS R.,** a minor, by Escarle R., guardian ad litem; **ESMERALDA V.,** a minor, by Laura V., guardian ad litem; **PAUL M.; JAIME R.,** a minor, by Karen R., guardian ad litem,

**Plaintiffs - Appellants,**

**v.**

**RICHARD D. SNYDER,** Governor; **JOHN C. AUSTIN,** member of MI Bd of Education; **MICHELLE FECTEAU,** member of the MI Bd of Education; **LUPE RAMOS-MONTIGNY,** member of the MI Bd of Education; **PAMELA PUGH,** member of the MI Bd of Education; **KATHLEEN N. STRAUS,** member of the MI Bd of Education; **CASANDRA E. ULBRICH,** member of the MI Bd of Education; **EILEEN WEISER,** member of the MI Bd of Education; **RICHARD ZEILE,** member of the MI Bd of Education; **BRIAN J. WHISTON,** Superintendent of Public Instruction for the State of MI; **DAVID B. BEHEN,** Director of the MI Dept of Technology; **NATASHA BAKER,** State School Reform/Redesign Officer, in their official capacities,

**Defendants - Appellees.**

---

On Appeal from the United States District Court for the
Eastern District of Michigan, the Honorable Stephen J. Murphy, III, Presiding
Case No. 2:16-cv-13292

---

## BRIEF OF APPELLANTS

[Counsel Listed On Inside Cover]

Mark D. Rosenbaum
Anne Hudson-Price
Kathryn A. Eidmann
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977
mrosenbaum@publiccounsel.org
aprice@publiccounsel.org
keidmann@publiccounsel.org

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
cphillips@sidley.com

Mark E. Haddad
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000
mhaddad@law.usc.edu

Evan H. Caminker
University of Michigan Law School
625 South State Street, 3250 South Hall
Ann Arbor, MI 48109
(734) 763-5221
caminker@umich.edu

Tacy F. Flint
Lawrence P. Fogel
Suzanne Brindise Notton
Jennifer M. Wheeler
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
tflint@sidley.com
lawrence.fogel@sidley.com
snotton@sidley.com
jwheeler@sidley.com

Joshua E. Anderson
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000
janderson@sidley.com

Bruce A. Miller
MILLER COHEN, PLC
600 West Lafayette Blvd., 4th Floor
Detroit, MI 49226
(313) 964-4454
brucemiller@millercohen.com

*Attorneys for Appellants*

## **CORPORATE DISCLOSURE**

Pursuant to Sixth Circuit Rule 26.1, Plaintiffs make the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

   No.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES...................................................................2

STATEMENT OF THE CASE........................................................................3

    I.     Plaintiffs Are Excluded from Michigan's Statewide System of Education.......................................................................................4

         A.    Michigan's Statewide Education System. ...................................4

         B.    Plaintiffs' Schools. .......................................................................7

               1.    Plaintiffs Do Not Receive Even a Basic Education. ........7

               2.    The Effect on Plaintiffs and Other Students Is Devastating. ........................................................................11

    II.    Proceedings Below. ..............................................................................13

         A.    Pleadings. ....................................................................................13

         B.    The District Court's Opinion. ....................................................14

               1.    The State Defendants' Control of Plaintiffs' Schools. ...14

               2.    Standing and Immunity. .................................................16

               3.    Plaintiffs' Claims under the Due Process Clause...........17

               4.    Plaintiffs' Claims under the Equal Protection Clause....19

SUMMARY OF THE ARGUMENT ....................................................................20

STANDARD OF REVIEW ...............................................................................24

ARGUMENT ....................................................................................................24

    I.    By Denying Plaintiffs Access to Literacy, Defendants Violated Plaintiffs' Rights under the Due Process Clause. ...............................24

         A.    The Due Process Clause Establishes a Fundamental Right to Access to Liberty. .................................................................24

1.      State-Provided Access to Literacy Is Deeply Rooted in Our Nation's History and Tradition. ..........................26

2.      State-Provided Access to Literacy Is Implicit in the Concept of Ordered Liberty...........................................28

3.      The District Court's Historical Analysis Was Flawed............................................................................31

B.      At a Minimum, the Due Process Clause Bars States from Compelling Children to Attend Schools That Do Not Provide Access to Literacy. ......................................36

1.      The State's Restraint of Plaintiffs' Liberty Gives Rise to a Corresponding Duty. .......................................36

2.      The Corresponding Duty Owed to Plaintiffs Includes Providing Access to Literacy.........................................40

II.    The Equal Protection Clause Prohibits the State from Denying Plaintiffs Access to Literacy. .............................................43

A.      Defendants Have Excluded Plaintiffs from the Statewide System of Education. ................................................43

1.      The State May Not Exclude a Discrete Group of Children from Access to Basic Minimal Skills.............43

2.      Plaintiffs Have Been Excluded from the Statewide System of Education That Defendants Control.............45

B.      The Proper Comparison Class Is Other Students Who Are Compelled to Participate in the Statewide System of Education. ......................................................48

C.      Michigan's Actions Fail Any Level of Scrutiny Because There Can Be No State Interest Sufficient to Deny a Discrete Group of Students Access to Literacy........................51

1.      Defendants' Actions Do Not Satisfy Heightened Scrutiny........................................................51

2.      Defendants' Actions Do Not Satisfy Rational Basis
        Review. ...........................................................................54

CONCLUSION ................................................................................................58

iv

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ambach v. Norwick,*
    441 U.S. 68 (1979)..................................................................................34

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................24, 55

*Bd. of Educ. of City of Grand Rapids v. Bacon,*
    162 N.W. 416 (Mich. 1917)...................................................................4

*Bd. of Educ. v. Pico,*
    457 U.S. 853 (1982)..............................................................................29

*Boddie v. Connecticut,*
    401 U.S. 371 (1971)..............................................................................29

*Brown v. Board of Education,*
    347 U.S. 483 (1954)...................................................................31, 40, 44

*Citizens United v. FEC,*
    558 U.S. 310 (2010)..............................................................................29

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
    489 U.S. 189 (1989)...................................................................38, 39, 40

*Estelle v. Gamble,*
    429 U.S. 97 (1976)................................................................................38

*Foman v. Davis,*
    371 U.S. 178 (1962)..............................................................................57

*Goss v. Lopez,*
    419 U.S. 565 (1975)..............................................................................31

*Griffin v. Illinois,*
    351 U.S. 12 (1956)................................................................................29

*Jackson v. Indiana,*
    406 U.S. 715 (1972)..............................................................................40

*Kadrmas v. Dickinson Pub. Sch.*,
    487 U.S. 450 (1988)..................................................................................25

*Luis v. Zang*,
    833 F.3d 619 (6th Cir. 2016) ...........................................................24, 42

*Marbury v. Madison*,
    5 U.S. 137 (1803).....................................................................................28

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)..................................................................................28

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)..................................................................................31

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015).................................................................26, 30, 35

*Papasan v. Allain*,
    478 U.S. 265 (1986)..................................................................................25

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
    268 U.S. 510 (1925)..................................................................................40

*Plyler v. Doe*,
    457 U.S. 202 (1982)............................................................................*passim*

*Prince v. Massachusetts*,
    321 U.S. 158 (1944)..................................................................................40

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978)..................................................................................54

*Reno v. Flores*,
    507 U.S. 292 (1993)..................................................................................38

*Revere v. Mass. Gen. Hosp.*,
    463 U.S. 239 (1983)..................................................................................38

*S.C. v. Katzenbach*,
    383 U.S. 301 (1966)..................................................................................54

*San Antonio Independent School District v. Rodriguez*,
   411 U.S. 1 (1973)......................................................................................*passim*

*Seminole Tribe of Fla. v. Fla.*,
   517 U.S. 44 (1996)....................................................................................32

*Town of Greece, N.Y. v. Galloway*,
   134 S. Ct. 1811 (2014)..............................................................................28

*Washington v. Glucksberg*,
   521 U.S. 702 (1997)................................................................................*passim*

*Welling v. Livonia Bd. of Ed.*,
   171 N.W.2d 545 (Mich. 1969)....................................................................6

*Youngberg v. Romeo*,
   457 U.S. 307 (1982)................................................................36, 37, 39, 40, 43

## Statutes

42 U.S.C. § 2000d....................................................................................13

Mich. Comp. Laws § 141.1554....................................................................6

Mich. Comp. Laws § 380.1561....................................................................30

Mich. Comp. Laws § 380.1599....................................................................30

Mich. Comp. Laws § 380.1280c....................................................................7

Mich. Comp. Laws § 380.1282....................................................................5

Mich. Comp. Laws § 388.1014....................................................................6

## Other Authorities

U.S. Const. art. I....................................................................................28

Mich. Const. Art. VIII............................................................................4, 6

34 C.F.R. § 100.3....................................................................................13

Barry Friedman & Sara Solow, *The Federal Right to an Adequate Education*, 81 Geo. Wash. L. Rev. 92 (2013) ........................................30, 32, 33

Steven G. Calabresi & Michael W. Perl, *Originalism and* Brown v. Board of Education, 2014 Mich. St. L. Rev. 429 ............................26, 27, 28, 30

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case concerns a matter of urgent significance to a class of schoolchildren in Detroit, who have for years been deprived of the opportunity to attain literacy—an opportunity that is guaranteed to them under the Fourteenth Amendment to the U.S. Constitution.  Moreover, this case concerns the exclusion of Plaintiffs from the statewide system of education maintained by Defendants, which not only deprives Plaintiffs of their rights now but risks stigmatizing them for the rest of their lives.  As the district court recognized, the constitutional issues presented in this case are both profoundly important and unresolved in the prior jurisprudence of the Supreme Court or this Court.  For these reasons, Plaintiffs request oral argument.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Plaintiffs' claims arise under the Constitution of the United States.  On June 29, 2018, the district court dismissed Plaintiffs' claims with prejudice and entered a final, appealable judgment for Defendants.  (Opinion and Order, RE.112; Judgment, RE.113.)  On July 26, 2018, Plaintiffs filed a notice of appeal that was timely under Federal Rule of Appellate Procedure 4(a)(1).  (Notice of Appeal, RE.114.)  On July 27, 2018, the district court *sua sponte* issued a corrected order dismissing the Complaint (Corrected Opinion and Order ("Opinion"), RE.117), and Plaintiffs filed an amended notice of appeal as to the revised order on July 30, 2018.  (Am. Notice of Appeal, RE.118.)  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether Defendants violated the Due Process Clause of the Fourteenth Amendment by: (a) denying Plaintiffs access to literacy—a fundamental right that is deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty; and (b) compelling Plaintiffs to attend schools, even though those schools fail to provide Plaintiffs the opportunity to attain literacy.

2.      Whether Defendants' system of education, which denies a discrete minority the opportunity to acquire literacy by assigning them, unlike other students who participate in Defendants' education system, to schools that do not deliver access to literacy, violates the Equal Protection Clause of the Fourteenth Amendment.

## STATEMENT OF THE CASE

This action is brought by seven Plaintiffs on behalf of a class of schoolchildren from five of the lowest performing traditional public and charter schools in Detroit. (Complaint, RE.1.) These schools, which serve almost exclusively low-income children of color, are schools "in name only"—buildings that warehouse children instead of educating them. (*Id.* at PageID#4–13, 62–65.) As detailed in the Complaint, Defendants' conduct knowingly reduced Plaintiffs' schools to this condition—subjecting Plaintiffs to an unsafe, degrading, and chaotic environment. (*Id.* at PageID#4–14, 57–58, 80–98.) Indeed, publicly reported factual developments that have occurred in the two years since the Complaint was filed—as Plaintiffs would allege if permitted leave to amend their Complaint—have degraded the schools at issue even further.

Nevertheless, Michigan law, implemented by Defendants, compels Plaintiffs to attend these schools. (*Id.* at PageID#4, 42–46.) Plaintiffs' liberty is curtailed by the State's compulsory education statute, which mandates that they spend over a thousand hours each year in school. Yet due to Defendants' deliberate conduct, Plaintiffs are deprived of the countervailing benefit that typically justifies such a curtailment, because the schools are so deficient that they do not offer Plaintiffs an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process—*i.e.*, the

3

opportunity to attain literacy.  The conditions at Plaintiffs' schools deny Plaintiffs and similarly situated schoolchildren access to literacy, and functionally exclude them from the education the State provides to others.  (*Id.* at PageID#7–8, 28–33.)

## I. Plaintiffs Are Excluded from Michigan's Statewide System of Education.

### A. Michigan's Statewide Education System.

"In Michigan, educational responsibilities begin at the state level." (Opinion, RE.117, PageID#2788.)  Under the Michigan Constitution, the State is required to "maintain and support a system of free public elementary and secondary schools," providing such education "without discrimination as to religion, creed, race, color or national origin."  Mich. Const. Art. VIII § 2.  The Michigan Constitution further provides that "[l]eadership and general supervision over all public education…is vested in a state board of education."  *Id.* § 3. Throughout its history, the Michigan Supreme Court has interpreted these provisions to establish the State's ultimate decision-making authority over and legal obligation to supervise the Michigan public school system.  In 1917, for example, the Michigan Supreme Court declared, "We have repeatedly held that education in this State is not a matter of local concern, but belongs to the State at large."  *Bd. of Educ. of City of Grand Rapids v. Bacon*, 162 N.W. 416, 416 (Mich. 1917) (internal citations and quotation marks omitted).

4

Michigan law does not merely impose obligations on the State to maintain an educational system, but imposes a reciprocal obligation on the citizens of Michigan to participate in that educational system:  All children in Michigan who are not home-schooled or enrolled in a State-approved private school are required by State law to attend a public school from ages 6 to 16.  Mich. Comp. Laws § 380.1561.

Under Michigan's constitutional structure, local school districts are creations and agents of the State.  The legislature created local school districts for the administrative purpose of effectively delivering public education.  *See* Mich. Comp. Laws § 380.1282.  However, as the district court acknowledged, "[c]ircumstances sometime[s] require more state involvement" than this statutory delegation contemplates.  (Opinion, RE.117, PageID#2789.)

The State has accordingly used various "mechanisms" under State law to "intervene in Detroit's public schools."  (*Id.*)  Through these mechanisms, State government officials have exercised day-to-day control of Plaintiffs' schools for most of the past fifteen years.  (Complaint, RE.1, PageID#50–52; *see also* Opinion, RE.117, PageID#2789–92.)  Since 2010, for example, the State has assumed responsibility over Plaintiffs' schools through the State School Reform/Redesign Office ("SRO"), which is charged with "creat[ing] the necessary conditions for sustainable and positive student outcomes."  (Complaint, RE.1, PageID#52.)  And

in 2011, the Michigan legislature transferred *all* authority over the Detroit Public Schools to a state-appointed Emergency Manager. (*Id.* at PageID#51.) This manager can unilaterally exercise any authority typically residing in a school board or superintendent. *See* Mich. Comp. Laws § 141.1554(f).

Defendants in this lawsuit, all of whom are sued in their official capacity, are State officials who are responsible for the statewide system of education, and who have taken direct control of Plaintiffs' schools. (Complaint, RE.1, PageID#23–26, 46–62.) Defendants Austin, Fecteau, Ramos-Montigny, Pugh, Straus, Ulbrich, Weiser, and Zeile are members of the Michigan Board of Education. (*Id.* at PageID#24.) *See* Mich. Const. Art. VIII § 3 (establishing a state board of education to "lead[]" and "supervis[e]" the Michigan educational system); *Welling v. Livonia Bd. of Ed.*, 171 N.W.2d 545, 546 (Mich. 1969) (stating that it is "the responsibility of the state board of education to supervise the system of free public schools set up by the legislature"). Defendant Whiston is the Superintendent of Public Instruction for the State of Michigan, which is the principal executive officer of the Michigan Department of Education and a non-voting member of the Board of Education, and is responsible for administering and enforcing state laws related to public education. (Complaint, RE.1, PageID#25.) Mich. Comp. Laws § 388.1014. Defendant Behen is the Director of the Michigan Department of Technology, Management, and Budget, who is responsible for appointing the State

6

SRO.  (*Id.* at PageID#25–26.)  Defendant Baker is the SRO, who is responsible for implementing the provisions of Mich. Comp. Laws § 380.1280c.  (*Id.* at PageID#26.)  Defendant Snyder, Governor of Michigan, has ultimate responsibility and control over administration of all State laws and regulations concerning education.  (*Id.* at PageID#23–24.)

### B.    Plaintiffs' Schools.

Plaintiffs' 136-page Complaint alleges detailed facts showing both the absence of basic learning tools in Plaintiffs' schools and the result of those conditions.

### 1.  Plaintiffs Do Not Receive Even a Basic Education.

The schools Plaintiffs attend are not truly schools by any traditional definition or understanding of the term.  (Complaint, RE.1, PageID#10–11.)  They are chaotic, under-resourced, and unsafe, lacking the necessary learning and teaching conditions for delivery of even the foundational building-block of education:  access to literacy.  (*Id.*)  The "deplorable" and "devastating" conditions in these schools include:  (1) insufficient and/or unqualified teaching staff; (2) the absence of textbooks, English Language Arts books, and other basic instructional materials; and (3) unsanitary and dangerous physical conditions.  (Opinion, RE.117, PageID#2796, 2819; Complaint, RE.1, PageID#10–16, 76–106.)

7

The details are grim.  The teacher shortage—approximately 170 documented vacancies throughout the 100 schools in the DPS system in the 2015-2016 school year and 200 in the following year—results in classes regularly being covered by non-certificated paraprofessionals, substitutes, or misassigned teachers who lack any expertise or knowledge in the subject course content to which they are assigned.  (Complaint, RE.1, PageID#102.)  Middle-school science classes at Hamilton were taught by a paraprofessional who acknowledged that she did not understand the material and could not lead experiments.  (*Id.* at PageID#102–03.)  Classes in seventh- and eighth-grade math were taught for about a month by an eighth-grade student, with a paraprofessional sitting in the room to assist with classroom management.  (*Id.* at PageID#15–16, 102–03.)  At Osborn MST, Chemistry and Physics classes were taught by long-term substitutes, and students were assigned to pedagogically inappropriate classes based on teacher availability.  (*Id*. at PageID#104.)  Students at Osborn MST typically average a period or two a day with a substitute or no teacher.  (*Id*. at PageID#105.)  At Cody MCH, approximately 30-40% of teachers were uncertificated, while many classes, like Science and Health, were taught by uncertificated long-term substitutes—and high school students are repeatedly shown movies like *Kung Fu Panda* and *Frozen* during scheduled class time.  (*Id.* at PageID#104–06.)  Nearly half of the teachers who started at Experiencia in the fall of 2012, few of whom were certified, quit by

the end of the second semester.  (*Id.* at PageID#99–104.)  Other classes were cancelled altogether because no qualified teacher was available.  (*Id.*)

In June 2016, the State perpetuated the shortage of qualified teachers in Plaintiffs' schools by passing legislation permitting non-certificated teachers to teach in Detroit public school classrooms.  (*Id.* at PageID#59–60, 106.)  This legislation does not apply to any other public school in Michigan.  (*Id.*)

The dearth of instructional materials is similarly dire.  Many classes in Plaintiffs' schools do not have books, and what books are available are often decades out of date, defaced, and missing pages.  (*Id.* at PageID#81.)  Not one of Plaintiffs' schools has textbooks for students to bring home, making it difficult for teachers to assign meaningful homework or, in many instances, any homework at all.  (*Id.*)  At Hamilton, even classroom sets of textbooks are not available.  (*Id.* at PageID#82.)  At Osborn Evergreen, a history class had five textbooks for 28 students and the economics class had 25 textbooks for 118 students for the 2016-17 school year. (*Id.* at PageID#82–83.)  Osborn's U.S. History textbooks were published in 1998, and there were no textbooks for a number of science courses. (*Id.*)  Teachers regularly tape up old, dilapidated copies, seek donations of books online, and spend thousands of dollars of their own monies (as much as one-sixth of their salary) to purchase books.  (*Id.* at PageID#82–86.)

9

The physical conditions in Plaintiffs' schools also prevent consistent instruction. (*Id.* at PageID#4, 12–13, 87–89.) Temperatures in classrooms regularly reach as high as 90 degrees in the summer-adjacent months, even 110 degrees in one school, and students and teachers have fainted, thrown up, and developed heat rashes as a result. (*Id.* at PageID#90.) At other times, because heating systems do not exist or no longer work properly, classrooms are so frigid that children can see their breath and must wear coats, scarves, and hats in their classrooms, making concentration impossible. (*Id.*) Consequently, school days are frequently cancelled or shortened. (*Id.*) Broken windows, doors, and fire alarms go unaddressed for months or years; ceilings are buckled and occasionally collapse; and floors are littered with fallen tiles and plastic buckets to catch water from leaking roofs. (*Id.* at PageID#12–13, 92–96.) As with books, teachers use their own resources to purchase furniture, paper towels, toilet paper, roach spray, cleaning supplies, and hand sanitizer. (*Id.* at PageID#11, 94–96.) Many classrooms lack sufficient desks for students, especially when classes are combined. One class at Osborn had 52 students, but only 37 chairs and fewer desks. (*Id.* at PageID#98.)

These conditions would be unthinkable in schools serving predominantly white, affluent student populations. (*Id.* at PageID#4–5.) And they make it impossible for young people to attain the basic literacy necessary to function—

much less thrive—in higher education, the workforce, and the activities of democratic citizenship. (*Id.*) Plaintiff students are thereby effectively excluded from Michigan's statewide system of public education. (*Id.*)

### 2.  The Effect on Plaintiffs and Other Students Is Devastating.

Years of federal and State achievement data reveal that, in Plaintiffs' schools, illiteracy is the norm. (*Id.* at PageID#7.) Proficiency rates in these schools hover near zero percent in all core curricular areas. (*Id.* at PageID#7, 65–71.) Students cannot read, write, or comprehend at anything approaching grade level or at levels close to their counterparts in schools across Michigan, rendering them unable to access State-mandated content in all subject areas and in all grades. (*Id.* at PageID#7–10.) These deficiencies mount as students move through school; without the proper foundation of basic literacy skills, students are unable to attain more sophisticated, age-appropriate comprehension and fluency in higher grades or across subjects. (*Id.*)

While elementary students at Hamilton do not receive access to such foundational skills of letter and word recognition, high-school students at Cody and Osborn struggle to sound out basic words and compose proper paragraphs, or even complete sentences. (*Id.*) A ninth-grade teacher at Cody was forced to assign her students a book with a third-grade reading level—a book they could not take home because of limited supplies—and the students spent the year reading the text

11

out-loud, paragraph by paragraph. (*Id.* at PageID#9, 79.)  Many students

experienced enormous difficulty reading even monosyllabic words. (*Id.*)  At

Osborn MST, only 1.9% of eleventh graders were proficient in English in the

2014-15 school year. (*Id.* at PageID#68.)  Across Plaintiffs' high schools, every

eleventh grader has 0% proficiency in at least Math, Science, or Social Studies.

(*Id.* at PageID#10.)

These outcomes are the direct and predictable result of the conditions at

Plaintiffs' schools.  As a consequence, children attending these schools are

stigmatized as unwilling learners uninterested in education. (*Id.* at PageID#6–10,

19–20.)  Indeed, the State in its district court brief attributed these results to factors

like the supposed "intellectual limitations" of Detroit schoolchildren.  (Mot.

Dismiss, RE.60, PageID#513.)  At Cody MCH, fewer than 4.3% of the 2013-14

senior cohort went on to complete at least a year of higher education, and the

percentages at the two Osborn schools were barely higher, compared to nearly a

third of Michigan's overall senior cohort.  (Complaint, RE.1, PageID#74–76.)

More than 80% of the Cody and Osborn students who did pursue post-secondary

education had to take remedial coursework at the community or four-year college

they attended. (*Id.* at PageID#73–74.)

Compounding these deficiencies, Plaintiffs' schools lack appropriate literacy

programs or curricula to intervene and remediate when students fall behind.  (*Id.* at

12

PageID#10, 76–80.)  At the elementary level, there is no consistent literacy instruction, and schools lack the staffing and capacity required to effectively implement such a program.  (*Id.* at PageID#76–77.)  Plaintiffs' high schools likewise do not have the capacity to effectively implement programs to deliver literacy instruction that would develop adolescent literacy capabilities.  (*Id.* at PageID#77.)  Teachers receive no support or training, let alone access to appropriate curricular materials.  (*Id.*)

## II.    Proceedings Below.

### A.    Pleadings.

Plaintiffs filed their Complaint on September 13, 2016.  (Complaint, RE.1.) The Complaint alleged that by failing to provide Plaintiffs even the most basic education—while simultaneously compelling Plaintiffs to spend hours each weekday during the school year in their respective schools—Defendants violated Plaintiffs' rights under the Due Process Clause.  (*Id.* at PageID#126–27.)  In addition, Plaintiffs contended that by functionally excluding Plaintiffs from the statewide system of education that Defendants operated, Defendants had violated Plaintiffs' rights under the Equal Protection Clause.  (*Id.* at PageID#126–27, 128.)[1]

---

[1] The Complaint also advanced causes of action for State-created danger and violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d and 34 C.F.R. § 100.3(b)(2), but Plaintiffs voluntarily dismissed these claims.  (Opinion, RE.117, PageID#2786.)

Plaintiffs sought declaratory and injunctive relief designed to "ensure that Plaintiffs and class members have the opportunity to attain literacy." (*Id.* at PageID#131–32.)

Defendants moved to dismiss the Complaint on November 17, 2016. (Mot. Dismiss, RE.60.) On June 29, 2018, the district court issued an opinion dismissing the Complaint with prejudice. (Opinion and Order, RE.112.) On July 27, 2018, the district court *sua sponte* issued a corrected order dismissing the Complaint.[2] (Opinion, RE.117.)

### B.    The District Court's Opinion.

### 1.    The State Defendants' Control of Plaintiffs' Schools.

The district court first considered Defendants' arguments that they were not properly named in this action and that the only proper defendants were local officials. The district court thoroughly reviewed the factual and statutory history relevant to this question—and conclusively rejected Defendants' argument.

As the court explained, "there is no question that the State has been heavily involved with Detroit schools for some time." (Opinion, RE.117, PageID#2792.) The court cited Public Act 10, a State law enacted in 1999, which "required Detroit's mayor to appoint a 'school reform board' charged with appointing a chief executive officer," one member of which was appointed by the State

---

[2] The district court's corrections were not material to its decision or analysis. (Notice of Correction, RE.116.)

14

Superintended of Public Instruction. (*Id.* at PageID#2789 (citing Act of March 26, 1999).) The court also noted that emergency managers—officials whose position was created by State law, who were appointed by the Governor, and who were compensated from State funds—had also been granted "significant power and authority to conduct the affairs of Detroit schools." (*Id.* at PageID#2792; *see also id.* at PageID#2789–91.) And the court recounted that the State had intervened in Detroit schools "through additional measures," including "the designation of Priority Schools and the creation of the Educational Achievement Authority," two additional State-led programs that permitted particular schools to be removed from the purview of the local school district. (*Id.* at PageID#2791–92 (citing, *inter alia*, Mich. Comp. Laws § 380.1280c).) In particular, the court noted, all of Plaintiffs' schools had been designated as Priority Schools and were accordingly "supervised by the SRO," a State official. (*Id.* at PageID#2791.)

The court concluded that "the State's involvement described here makes its actors the proper parties to sue in this case." (*Id.* at PageID#2792.) The State defendants named "were responsible for the selection and appointment of the emergency managers," who "'serve[d] at the pleasure' of the Governor," and "had a role in the designation and supervision of Priority Schools." (*Id.* at PageID#2795–96.) As the court further explained, "Detroit residents have repeatedly pushed back against the Public Acts and state actions that supplanted

15

local control.…Now, facing the deplorable conditions alleged in the Complaint, Detroit students seek to hold someone responsible.  They have adequately pled that state actors effectively control the schools, at least in part, and are therefore proper parties."  (*Id.* at PageID#2796.)

### 2. Standing and Immunity.

The district court also rejected Defendants' contention that Plaintiffs failed to establish Article III standing.  The court held that Plaintiffs had alleged injury in fact because the allegations—that their schools' physical conditions made learning "'nearly impossible,'" that their schools "lack enough teachers to hold classes in which they would learn to read," and that "they lack books necessary to attain literacy"—established "concrete, particular, actual injuries that satisfy the standing requirement."  (*Id.* at PageID#2798–99.)  The court held that the allegations were also sufficient to establish traceability and causation, because the Complaint "plainly lays out each Defendant's position in the State government and how that position relates to the operation of Detroit schools," and likewise "provides the necessary description of a causal chain" between Defendants' actions and the violation of Plaintiffs' constitutional rights.  (*Id.* at PageID#2799–2800.)

And the court rejected Defendants' contention that Plaintiffs' claims were not redressable: "Plaintiffs do not allege the deprivation of literacy, nor an entitlement to it; they plead only for *access* to literacy," a claim that would be

16

redressed by improving the conditions and educational opportunities provided in Plaintiffs' schools. (*Id.* at PageID#2801 (emphasis added).)

Finally, the court rejected Defendants' assertions that Plaintiffs' claims seeking injunctive relief were barred by the Eleventh Amendment and that a prior decision in an unrelated case with different parties barred Plaintiffs' suit. (*Id.* at PageID#2801–06.)

### 3.    Plaintiffs' Claims under the Due Process Clause.

The district court then turned to the constitutional questions raised in Plaintiffs' Complaint. Defendants had argued that Plaintiffs' claims under the Due Process Clause were foreclosed by *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973). (*See, e.g.*, Mot. Dismiss, RE.60, PageID#501.) After engaging in a thorough examination of *Rodriguez* and other decisions regarding education, the district court concluded that "[t]he questions raised in the instant case…are different from the prior cases." (Opinion, RE.117, PageID#2810.) "The *Rodriguez* Court specifically avoided ruling on whether the functional deprivation of literacy access would violate the Due Process Clause." (*Id.* at PageID#2811.) Because *Rodriguez* "did not reach the argument" that Plaintiffs make here, *Rodriguez* "is not dispositive." (*Id.*) In short, "the Supreme Court has neither confirmed nor denied that access to literacy is a fundamental right." (*Id.* at PageID#2813.)

Setting out to answer that question, the district court drew a stark line between so-called "positive rights" and "negative rights." (*Id.* at PageID#2815–16.) Although the court opined that "a case like this one could be argued on either positive- or negative-right theories," the court chose to "construe the Complaint" as advancing only a positive-right theory. (*Id.*) The court recognized that "[t]he Complaint notes the compulsory nature of schooling in Michigan," and quoted an argument from Plaintiffs' brief opposing dismissal that "Michigan's truancy law means 'students at Plaintiffs' schools are unable to use mandatory school days in other productive ways.'" (*Id.* at PageID#2816 (quoting Resp. Mot. Dismiss, RE.64, PageID#1431).) Nonetheless, the court declared that "the Complaint points exclusively to a positive-right argument." (Opinion, RE.117, PageID#2816.) Accordingly, the court did not acknowledge, let alone assess, whether Plaintiffs had stated a claim under any negative-right theory.

The court determined that the Due Process Clause did not protect any positive right to access to literacy. The court explained that "the Supreme Court's understanding of a 'fundamental right,' requires finding that neither liberty nor justice would exist absent state-provided literacy access." (*Id.* at PageID#2818 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).) The court said any such finding would be "difficult to square with the fact that '[t]here was no federal or state-run school system anywhere in the United States as late as

18

1830.'" (*Id.* (quoting Barry Friedman & Sara Solow, *The Federal Right to an Adequate Education*, 81 Geo. Wash. L. Rev. 92, 117 (2013).)  The court further explained that "[t]he conclusion that education is not a fundamental right is arguably implicit even in *Brown v. Board of Education*, in which the Supreme Court stated that the opportunity of an education, "where the state has undertaken to provide it, is a right which must be made available to all on equal terms."  347 U.S. 483, 493 (1954).  The court read this passage as pointing to the conclusion that "a state could choose not to undertake the provision of education at all." (Opinion, RE.117, PageID#2819.)

### 4.   Plaintiffs' Claims under the Equal Protection Clause.

Finally, the district court turned to Plaintiffs' Equal Protection claims. Critical to the court's analysis was its identification of the proper comparator class. Although the court recognized that Plaintiffs claimed that they had been functionally excluded from Michigan's statewide education system, the court held that "Michigan schools as a whole are not the proper comparator." (*Id.* at PageID#2821.)  That was because "Michigan's laws…put the State in a different posture with respect to distressed schools than schools that have not required state intervention." (*Id.*)  Under this reasoning, the court concluded that "[t]he appropriate comparators for an equal-protection claim are therefore other Michigan

19

schools that have come under the control of emergency managers, been designated a Priority School, or were governed by the EAA." (*Id.*)

Having "[s]o framed" the equal protection analysis, the court determined that "the Complaint fails to state an equal-protection claim." (*Id.*) The Complaint did not, for example, "state any instance where Defendants intervened in a school with a different racial makeup and treated that school disparately." (*Id.* at PageID#2822.) Nor did the complaint adequately "identify the specific decisions Defendants made concerning Plaintiffs' schools that could have been made differently," as the court thought necessary to show "the irrationality of such decisions." (*Id.* at PageID#2824.)

The court ordered dismissal with prejudice. (*Id.*) Final judgment was entered the same day. (Judgment, RE.113.)

## SUMMARY OF THE ARGUMENT

This case is about bringing an end to the stigma of illiteracy imposed upon children who are compelled by Michigan law to attend school, but whose schools do not provide them the opportunity to acquire literacy. Plaintiffs' "schools" contain classrooms that have no teachers, no textbooks, and little or no functioning temperature-, sanitation- or pest-control. When teachers are present, they cannot assign homework because the students have no books to take home. The buildings where Plaintiffs are, for all intents and purposes, warehoused for seven hours a day

20

impose their own grotesque barriers to learning and teaching, including classroom temperatures ranging from freezing to over 90 degrees, vermin, and unworkable toilets.  The academic outcome at these schools is both predictable and heartbreaking, with near zero percent of students achieving proficiency in State-mandated subjects.  By compelling Plaintiffs to attend these "schools" each day—without providing them in exchange any opportunity to gain a meaningful education, including access to literacy—Defendants have violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

The Due Process Clause requires Defendants to provide Plaintiffs access to literacy.  State-provided access to literacy is both "deeply rooted in this Nation's history and tradition" and "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [it] were sacrificed.'"  *Glucksberg*, 521 U.S. at 720–21.  The unique and profound role that State-provided access to literacy has played in American history and tradition is well documented.  In 1868, when the Fourteenth Amendment was ratified, a supermajority of state constitutions guaranteed an education to their citizens—and today, every state in the union provides public education and *mandates* that students attend school.  State-provided access to literacy also sustains the American concept of ordered liberty, because liberty in the American system of government is assured through our fealty to a written Constitution and to a system of laws that are both published

21

and fixed in writing.  The ability to decode our foundational and controlling legal texts is thus a prerequisite to exercise of the legal rights protected by these controlling texts.  Although the Due Process Clause may not require States to provide any particular *quality* of education, it does protect a fundamental right to the irreducible core of access to literacy.  Yet Defendants have failed to provide even that.

Moreover, by compelling students to attend schools, the State significantly restricts the personal liberty of school-age children and therefore is obligated under the Due Process Clause not to restrict that liberty arbitrarily.  To avoid an arbitrary deprivation of liberty through mandatory school attendance, a State must fulfill its corresponding duty of providing students an opportunity to acquire basic minimal skills—namely, access to literacy.  Here, by compelling Plaintiffs to attend schools that do not offer them the opportunity to attain literacy, the State's deprivation of Plaintiffs' liberty is arbitrary.  The district court declined to address Plaintiffs' "negative" formulation of the right to access to literacy, and yet the State has never offered any explanation of how it can be anything other than arbitrary to detain children in buildings that are "schools" in name only.

Defendants' failure to provide Plaintiffs with access to literacy independently violates the Equal Protection Clause.  Defendants oversee and hold ultimate responsibility for the statewide system of education in which children

22

throughout the State of Michigan are compelled to participate.  Nearly all children, attending nearly all public schools in the State, receive the benefit of access to literacy by attending school.  Yet in their schools, Plaintiffs receive different—and fundamentally unequal—treatment.  Plaintiffs, who attend schools that are overwhelmingly populated by students of color, have been functionally excluded from the statewide system of education, because their schools do not provide even the most basic education.  This exclusion cannot be reconciled with *Plyler v. Doe*, 457 U.S. 202 (1982), in which the Supreme Court struck down a Texas statute that resulted in the functional "denial of education to some isolated group" of children, because such a denial "pose[d] an affront to one of the goals of the Equal Protection Clause:  the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit."  *Id.* at 221–22.

Defendants' exclusion of Plaintiffs from the statewide system of education in Michigan is every bit as troubling as that declared unlawful in *Plyler*.  The exclusion of Plaintiffs from access to literacy poses the same affront to the goals of equal protection, creating the same risk of a permanent, State-created "underclass" that "presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law."  *Id.* at 219.  Just as the exclusion of children from the Texas education system lacked any legitimate justification in *Plyler*, so too do Defendants' actions here.

23

**STANDARD OF REVIEW**

This Court reviews the district court's order dismissing the Complaint de novo.  *Luis v. Zang*, 833 F.3d 619, 625 (6th Cir. 2016).  A complaint may not be dismissed if it "state[s] a claim to relief that rises 'above the speculative level' and is 'plausible on its face.'"  *Id.* (quoting *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In evaluating dismissal of Plaintiffs' Complaint at this stage, the Court is required to "accept the complaint's well-pleaded factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor."  *Luis*, 833 F.3d at 626.

**ARGUMENT**

**I.   By Denying Plaintiffs Access to Literacy, Defendants Violated Plaintiffs' Rights under the Due Process Clause.**

**A.   The Due Process Clause Establishes a Fundamental Right to Access to Liberty.**

In the district court, Defendants took the position that "as important as literacy may be, the United States Supreme Court has unambiguously rejected the claim that public education is a fundamental right under the Constitution."  (Mot. Dismiss, RE.60, PageID#501 (citing *Rodriguez*, 411 U.S. at 29, 35).)  As the court recognized, however, that is incorrect.  (Opinion, RE.117, PageID#2813.)  The

24

Supreme Court in *Rodriguez* determined that there was no "interference with fundamental rights" where the State of Texas had "provided what it considers to be an adequate base education for all children," and "where only *relative differences in spending levels* [were] involved." 411 U.S. at 25 n.60, 37 (emphasis added). But the Court made explicit that the case before it did not present the question of whether there is a fundamental right to "some identifiable quantum of education" sufficient to provide children with the "basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." *Id.* at 36–37. And the Court took pains to emphasize that if a "class of 'poor' people" were "absolutely precluded from receiving an education[, t]hat case would present a far more compelling set of circumstances for judicial assistance than the case before" the *Rodriguez* Court. *Id.* at 25 n.60. Later reiterating the limits of its holding, the Court wrote that "[a]s *Rodriguez* and *Plyler* indicate, this Court has not yet definitively settled the question[] whether a minimally adequate education is a fundamental right." *Papasan v. Allain*, 478 U.S. 265, 285 (1986); *accord Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 466 n.1 (1988) (Marshall, J., dissenting) (noting that the issue "remains open today").

The role of education in our nation establishes that there *is* a fundamental right to State-provided access to literacy protected by the Due Process Clause. In *Glucksberg*, the Court wrote: "the Due Process Clause specially protects those

25

fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." 521 U.S. at 720–21 (internal citations and quotation marks omitted); *see also Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015) (courts must "exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect"; "[h]istory and tradition guide and discipline this inquiry but do not set its outer boundaries") (*quoting Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)).  Access to literacy—which has deep roots in our nation's history and which is essential to the functioning of our democracy—fits squarely within this narrow definition of a fundamental right.

### 1.    State-Provided Access to Literacy Is Deeply Rooted in Our Nation's History and Tradition.

To begin, historical analysis confirms that the right to a basic education is "deeply rooted in this Nation's history and tradition"—and indeed has been part of American history since at least the ratification of the Fourteenth Amendment.  A 2014 study found that more than three-quarters of States recognized an affirmative right to public school education in 1868, the year that the Fourteenth Amendment was ratified.  Steven G. Calabresi & Michael W. Perl, *Originalism and* Brown v. Board of Education, 2014 Mich. St. L. Rev. 429, 449–63 (cataloging all State constitutional provisions as of 1868).  The three-quarters threshold is significant

because "Article V of the federal Constitution requires a three-quarters consensus of the states to amend the Constitution." *Id.* at 443.  Thus, "an Article V consensus of three-quarters of the states in 1868 should be sufficient for establishing that a right is 'fundamental,' since it would be sufficient for approval of a constitutional amendment." *Id.* at 444.  Such pervasive state constitutional recognition at the time of ratification "objectively" establishes the fundamental nature of this right. *Glucksberg*, 521 U.S. at 720–21.  It also distinguishes the right to a basic education from other important social benefits that a supermajority of states had not committed to provide by 1868.

In 1868, there were 37 states in the union—and well above three-quarters of them guaranteed a right to education.  Specifically, 30 states (*i.e.*, 81%) had a constitution that "said explicitly that the state legislature 'shall' (*i.e.*, it has the 'duty' and therefore it 'must') establish a system of free public schools."  Calabresi & Perl, 2014 Mich. St. L. Rev. at 451–54 (listing these 30 states and quoting their constitutional provisions).[3]  Another three states' constitutions "arguably conferred a right to a free public education," while only four "states' constitutions in 1868 did not specifically mention education or the establishment of a system of free public schools."  *Id.* at 455–60.  It is thus "as clear as day that there was an

---

[3] Michigan was one of these states.  *See* Calabresi & Perl, 2014 Mich. St. L. Rev. at 452–53 n.109 (citing Mich. Const. of 1850, art. XIII, § 4).

Article V consensus of three-quarters of the states in 1868 that recognized that children have a fundamental right to a free public school education." *Id.* at 460; *compare McDonald v. City of Chicago*, 561 U.S. 742, 777–78 (2010) (plurality opinion) (citing similar historical analysis for the proposition that "[t]he right to keep and bear arms was also widely protected by state constitutions at the time when the Fourteenth Amendment was ratified," and was thus applicable to the States through the Fourteenth Amendment); *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1838 (2014) (Thomas, J., concurring) (assessing scope of the Fourteenth Amendment based on State constitutions as of 1868).

### 2. State-Provided Access to Literacy Is Implicit in the Concept of Ordered Liberty.

Second, it is equally clear that State-provided access to literacy is "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720–21 (internal quotation marks omitted). The foundation of American liberty is our written Constitution. *See Marbury v. Madison*, 5 U.S. 137, 176, 178 (1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written"; declaring "a written constitution" to be "the greatest improvement on political institutions" that came before the American experiment). Likewise, under our written Constitution, laws must be published in writing before they may be executed to constrain liberty. *See* U.S. Const. art. I §§ 9–10

28

(prohibiting the enactment of any "ex post facto law" by Congress or state legislatures). Thus, written texts lie at the heart of our ordered liberty—and neither liberty nor justice as those concepts are conceived in the American tradition would exist without a shared capacity to decode our governing texts.

Basic literacy is also a prerequisite for the activities that form the basis of citizenship in our democracy. For example, literacy is critical to participation in the political process, including "knowledgeable and informed voting," comprehending ballot initiatives, and engaging in political speech and discourse. (Complaint, RE.1, PageID#34–35.) *See also Citizens United v. FEC*, 558 U.S. 310, 339–40 (2010); *Bd. of Educ. v. Pico*, 457 U.S. 853, 866–67 (1982) ("[T]he Constitution protects the right to receive information and ideas." (internal quotation marks omitted)). Literacy skills are also necessary to engage in activities of citizenship, such as enlisting in military service, obtaining government entitlements, and "comply[ing] with mandatory government requirements such as filing tax forms or selective service registration." (Complaint, RE.1, PageID#34–35.) In addition, lack of literacy, in practice, precludes individuals from constitutionally protected access to the justice system. *Id.*; *see also, e.g.*, *Griffin v. Illinois*, 351 U.S. 12, 19–20 (1956); *Boddie v. Connecticut*, 401 U.S. 371, 382–83 (1971). Plaintiffs' exclusion from the democratic process also carries with it the

State's unmistakable imprimatur of disrespect and subordination. *See Obergefell*, 135 S. Ct. at 2602.

The necessity of literacy to ordered liberty explains why public, State-provided education has such deep, inextricable roots in our nation's history. In the words of Professors Calabresi and Perl, "[a]t a minimum, children must be taught to read so they can read the laws for themselves—a task that many of the Framers would have thought was fundamental." Calabresi & Perl, 2014 Mich. State L. Rev. at 552. Indeed, so foundational is access to literacy that education has been singled out for unique treatment among state activities. For a century, every single state has had compulsory education laws. Friedman & Solow, 81 Geo. Wash. L. Rev. at 127 ("By 1918, education was compulsory in every state of the union."). In other words, children throughout Michigan and the nation are compelled to attend school full time (or be home-schooled) under penalty of fines and jail time. *See* Mich. Comp. Laws §§ 380.1561, 380.1599; *see also* (Complaint, RE.1, PageID#4–5, 43.) This means that—unless their parents satisfy this legal obligation through other means—each state confines school-age children in its public schools for the majority of days each year.

History and practice make clear that this deprivation of the liberty children and their families otherwise would have to pursue activities of their own choosing is justified by the unique importance of education and its deep roots in this

Nation's history and tradition.  As the Supreme Court explained in *Brown v. Board of Education*, "education is [ ] the most important function of state and local governments," as demonstrated by our "[c]ompulsory school attendance laws and the great expenditures for education."  347 U.S. at 493; *see also Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted.").  Indeed, so crucial is education to ordered liberty that courts require that procedural due process be afforded not when children are confined to school—but when children are expelled or suspended from school, and thus deprived of their interest in a State-sponsored education.  *Goss v. Lopez*, 419 U.S. 565, 579 (1975) ("[S]tudents facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing…to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences.").

### 3.      The District Court's Historical Analysis Was Flawed.

The district court acknowledged that "history evinces a deep American commitment to education."  (Opinion, RE.117, PageID#2818.)  Nonetheless, the court concluded that "ordered society" does not "demand[] that a state provide" access to literacy.  (*Id*.)  In support of its statement, the court cited the scholarship of Professors Barry Friedman and Sara Solow regarding what state-sponsored

31

education existed at the time of the nation's founding—*i.e.*, in 1789.  The court

wrote that "[s]chool districts at the time of the Constitution's ratification were

formed 'when a group of farms came together and decided to construct a public

building for schooling, where their children could gather and be taught reading,

writing, and moral codes of instruction,'" and "'there was no federal or state-run

school system anywhere in the United States as late as 1830.'"  (*Id.* (quoting

Friedman & Solow, 81 Geo. Wash. L. Rev. at 112, 117).)

By confining its inquiry to State-provided education as of 1789, the district

court asked the wrong question.  Plaintiffs' claims arise under the Fourteenth

Amendment, ratified in 1868.  It is indisputable that the Fourteenth Amendment

"fundamentally altered the balance of state and federal power struck by the

Constitution" as it had previously existed.  *Seminole Tribe of Fla. v. Fla.*, 517 U.S.

44, 59 (1996).  Thus, whether that amendment cemented a particular fundamental

right against the states cannot be determined by review of the political landscape at

the time of the founding, nearly 80 years earlier.  Those intervening decades saw

dramatic change.  As the same law review article on which the district court relied

explains, the nation experienced "rapid development concerning the right to

education [during] the common schools movement, dating roughly from 1830

through 1870."  Friedman & Solow, 81 Geo. Wash. L. Rev. at 121.  This

movement "bestowed upon American society the statewide public school system,"

32

which became pervasive by the time the Fourteenth Amendment was adopted. *Id.* at 122–24. Although "[i]n 1834, only eleven out of twenty-four state constitutions, or just under fifty percent, had contained any language on education," that number had dramatically shot up by 1868, "mak[ing] the case for a federal right under the Due Process clause particularly compelling." *Id.* at 124. The district court simply ignored that, at the relevant time period, the evidence is overwhelming that the States had accepted that they had an affirmative duty to provide children the "opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." *Rodriguez*, 411 U.S. at 37.

The district court was also wrong to liken access to literacy to every other benefit that a state may provide. (*See* Opinion, RE.117, PageID#2817–18 (acknowledging that deprivation of access to literacy "results in a limitation of future opportunities and social stigma," but concluding that "the same could presumably be said for a person who must go without a sanitary place to live, or must live in an abusive home—and neither of those implicate a fundamental right.").) To be sure, the Court in *Rodriguez* questioned how education is "to be distinguished from the significant personal interests in the basics of decent food and shelter." 411 U.S. at 37. But the question is readily answered: No comparable objective indicia—such as a supermajority of States committing in

33

1868 to provide public education—has been advanced in support of a claim to public housing or to many other social benefits.  For this reason alone, judicial recognition of a fundamental right to a basic education would not compel recognition of a fundamental right to other social welfare benefits.  That may explain why the Supreme Court recognized in *Plyler*, five years after *Rodriguez*, that access to literacy is ***not*** "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation."  *Plyler*, 457 U.S. at 221.  Because "education has a fundamental role in maintaining the fabric of our society,…[w]e cannot ignore the significant social costs borne by our Nation when *select groups are denied the means to absorb the values and skills upon which our social order rests.*"  *Id.* (emphasis added); *see also Ambach v. Norwick*, 441 U.S. 68, 77 (1979) (public schools "inculcat[e] fundamental values necessary to the maintenance of a democratic political system").

By equating access to literacy to other government-provided benefits, the district court misunderstood Plaintiffs' claim.  Plaintiffs do not criticize the quality of their education merely as it compares to that available in other better-financed schools, or contend that a better-funded educational experience would allow them to, for example, engage in more effective speech or make a more informed electoral choice.  *See Rodriguez*, 411 U.S. at 36.  Instead, Plaintiffs' claim is the one that the Supreme Court in *Rodriguez* deliberately left open—that the State of

34

Michigan's treatment of them and their schools has "occasioned an absolute denial of educational opportunities" for Plaintiffs, *id.* at 37, which means they will be excluded absolutely from the exercise of their constitutional rights and participation in American democracy and economic life.

Judicial recognition of fundamental rights protected by the Fourteenth Amendment is rare—and appropriately so.  But the unique role of access to literacy in American history and liberty compels the recognition of State-provided access to literacy as one of those rare affirmative rights—like the right to State-recognized marriage—that is enshrined in the Constitution.  *See Obergefell*, 135 S. Ct. at 2601–02.  So firmly implanted is the fundamental right to access to literacy that every State in the union has already committed by law to providing a basic education to all of its residents, and mandating that its residents partake of the education provided.  *Compare id.* at 2601 ("The States have contributed to the fundamental character of the marriage right by placing that institution at the center of so many facets of the legal and social order.").  Recognition of this federal constitutional imperative thus will not burden States with novel responsibilities beyond those they have felt duty-bound to shoulder for more than a century.  It will instead protect individuals like Plaintiffs from "[t]he imposition of this disability" that results from being denied access to literacy, which "serves to disrespect and subordinate them."  *Id.* at 2604.  While a State's provision of housing has

35

indisputable value to an individual who needs it, it does not hold the same place in American history and liberty as access to literacy.

### B.    At a Minimum, the Due Process Clause Bars States from Compelling Children to Attend Schools That Do Not Provide Access to Literacy.

While the Fourteenth Amendment guarantees a fundamental right to access to literacy, the Court need not reach that issue to reverse the decision below.  The facts alleged in the Complaint establish that Defendants compel Plaintiffs to spend hours of each day in their "schools," yet fail to provide them the opportunity to acquire basic minimal skills during those hours.  As alleged, this confinement of students in buildings that are schools in name only, without offering the concomitant benefit of access to literacy, violates the Fourteenth Amendment.

### 1.    The State's Restraint of Plaintiffs' Liberty Gives Rise to a Corresponding Duty.

Whether or not the Fourteenth Amendment requires the State to provide access to literacy, Michigan has affirmatively assumed this obligation by compelling children throughout the State to spend hours of every school day in a school.  *See* p.5, *supra*.  As Supreme Court precedent makes clear, the Due Process Clause is implicated when a state takes on a custodial role and thus imposes limitations on an individual's liberties.  Most prominently, in *Youngberg v. Romeo*, the Court considered the substantive rights of an intellectually disabled person involuntarily committed to a state institution.  457 U.S. 307, 314 (1982).  The

committed individual did not challenge the legality of his commitment, but rather argued that he had a constitutionally protected liberty interest in safety, freedom of movement, and training within the institution, and that the defendants infringed these rights by failing to provide him with these constitutionally required conditions and services at the institution where he was confined. *Id.* at 315. In ruling for the individual, the Court held that a state has an affirmative duty not only to house those persons who have been committed in clean and safe conditions, and to minimize physical restraints on their liberty, but also to provide them with minimally adequate training. *Id.* at 319. "In this case," the Court explained, "the minimally adequate training required by the Constitution is such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints." *Id* at 322.

*Youngberg* thus stands for the proposition that when a State takes on a custodial role with regard to a person, the State also takes on certain affirmative duties. As the Court has explained:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.…The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, *it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—*

37

> *which is the "deprivation of liberty" triggering the protections of the Due Process Clause*, not its failure to act to protect his liberty interests against harms inflicted by other means.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) (emphasis added). *See also Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) (holding that because an inmate has been deprived of his liberty to care for himself, the Constitution requires that the State care for him); *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (similar); *Reno v. Flores*, 507 U.S. 292, 315 (1993) (O'Connor, J., concurring) ("A person's core liberty interest" is implicated not only by imprisonment, but also by confinement in "some other form of custodial institution, even if the conditions of confinement are liberal.").

Significantly, such affirmative obligations on the state do not arise only when the state imposes restrictions identical to those found in prisons or mental institutions. Indeed, the *DeShaney* Court explained that affirmative duties may be triggered by restraints on liberty other than those found in prisons and mental institutions, such as in foster care. 489 U.S. at 201 n.9. These claims are all consistent with the principle set forth in *Youngberg* that a State, having undertaken to restrict an individual's liberty, has a corresponding duty to provide some minimal services to those in custody. For the State to restrain liberty without fulfilling that duty is an inherently arbitrary deprivation of liberty.

38

Plaintiffs do not contend that Michigan's compulsory attendance laws are inherently unconstitutional, just as the plaintiff in *Youngberg* did not challenge the legality of his confinement. To the contrary, compulsory attendance laws are constitutionally permissible—and indeed, have been recognized as necessary to preserve American democracy—precisely because of the unique role that education plays in the nation's historical and constitutional structure. But, as in *Youngberg*, "[t]he mere fact" that Plaintiffs' confinement to schools may be constitutionally permissible "does not deprive [them] of all substantive liberty interests under the Fourteenth Amendment." 457 U.S. at 315 (citing *Vitek v. Jones*, 445 U.S. 480, 491–94 (1980)). Put simply, to confine a child for hundreds of hours each year in a "school" that does not offer an opportunity to attain literacy is arbitrary, and thus violates the Due Process Clause.

*DeShaney*, upon which the district court relied in part, does not counsel otherwise. In *DeShaney*, the plaintiff sued the defendant social workers and other local officials for failing to protect him from an abusive father in violation of the Due Process Clause. 489 U.S. at 191. Critically, the harms the plaintiff suffered occurred "not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor." *Id.* at 201. Moreover, the State played no part in the creation of the harm, nor did it do anything to render the plaintiff any more vulnerable to harm. *Id.* Thus, having taken on no duty to the

39

plaintiff, the State was not liable for the harm perpetrated by a private actor. *Id.* In contrast, the State here has undertaken to hold Plaintiffs and all other school-age children in its custody each school day. The State's affirmative act of restraining Plaintiffs' liberties through the imposition of compulsory attendance gives rise to a "corresponding duty" to those in its custody. *Id.* at 199–200.

### 2.    The Corresponding Duty Owed to Plaintiffs Includes Providing Access to Literacy.

The question, accordingly, is what the State is required to provide when it subjects students to regular confinement through compulsory attendance. As *Youngberg* illustrates, the duty the State owes depends in significant part on the purpose of custody. *Id.* at 324; *see also Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."). Here, the Due Process Clause permits the State to mandate school attendance for the purpose of providing education. *See Brown*, 347 U.S. at 493 (compulsory education laws further state and local governments' "most important function" of providing education); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("Acting to guard the general interest in youth's well-being, the state, as *parens patriae*, may restrict the parent's control by requiring school attendance."); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534 (1925) ("No question is raised concerning the power of the state…to require

40

that all children of proper age attend some school…that certain studies plainly essential to good citizenship must be taught.").

Thus, if the State's confinement of students is to satisfy the Due Process Clause under *Youngberg*, the conditions of its confinement must bear some "reasonable relation" to that purpose. *Some* basic educational function must be served. By compelling school attendance, therefore, the State must shoulder the duty to provide each child with what *Rodriguez* described as a minimum "quantum of education"—*i.e.*, the basic education "necessary for the enjoyment of the rights of speech and of full participation in the political process." 411 U.S. at 36–37. That quantum of education is access to literacy. The Due Process Clause requires at least this much.

If the law were otherwise—if the State shouldered no obligation to provide the children that it compels to attend school with some opportunity to acquire basic minimal skills—then the State could simply detain children in a warehouse for hours each weekday without any attempt whatsoever at providing instruction. Such "warehousing" obviously would be unconstitutional, and the State does not even attempt to defend it. Significantly, the State has offered no rational basis for compelling children to attend school but then providing them no meaningful opportunity to attain literacy while they are there—and there is none. The State's actions in confining Plaintiffs to schools without providing them any opportunity

to attain literacy violates the Due Process Clause for this independent reason as well.

Notably, the district court did not disagree. Instead, the court simply refused to consider the issue. It said that "a violation of negative rights is not what the Complaint truly seems to argue," and therefore "construe[d] the Complaint" as making "exclusively…a positive-right argument"—even though the court openly acknowledged that "the allegations [of the Complaint] state the violation of a negative right." (Opinion, RE.117, PageID#2815–16.) In fact, both the Complaint and Plaintiffs' opposition to dismissal asserted that the State's confinement of students through compulsory attendance laws violates the Due Process Clause. (Complaint, RE.1, PageID#4–5, 42–43, ("Michigan's compulsory attendance laws require Plaintiffs to attend these schools, but they are schools in name only"); Resp. Mot. Dismiss, RE.64, PageID#1440–41 ("By detaining Plaintiffs daily in schools while denying them the opportunity to achieve literacy, Michigan directly and arbitrarily infringes a fundamental liberty interest.").) And if the question were close—which it is not—the district court was required to "construe the complaint in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor." *Luis*, 833 F.3d at 626. The issue of Plaintiffs'

42

unlawful confinement of students was presented below, and dismissal without consideration of this argument was error.[4]

## II.    The Equal Protection Clause Prohibits the State from Denying Plaintiffs Access to Literacy.

Defendants' actions—compelling Plaintiffs to attend school but providing them no meaningful opportunity to attain literacy while there—separately violates the Equal Protection Clause.  Although Plaintiffs are nominally given slots at schools within the State education system, the education that the State system is designed to provide—and does provide to other children in Michigan—is denied them.  They are functionally excluded from the State system of education.  The Equal Protection Clause does not permit such treatment.

### A.    Defendants Have Excluded Plaintiffs from the Statewide System of Education.

#### 1.    The State May Not Exclude a Discrete Group of Children from Access to Basic Minimal Skills.

Given the importance of "the opportunity of an education," the Court has made clear since *Brown* that "[s]uch an opportunity, where the state has undertaken

---

[4] The district court also stated that "the relief sought is exclusively positive in nature"—namely, improvements to the education furnished to Plaintiffs to permit them an opportunity to attain literacy.  (Opinion, RE.117, PageID#2816.)  In this respect, the district court was correct:  Plaintiffs do not seek the alternative remedy of invalidating Michigan's compulsory attendance law.  Plaintiffs instead seek to have the constitutional violation remedied with an order requiring the State to provide Plaintiffs an opportunity to attain literacy during the hours they are confined to school—analogous to the relief granted in *Youngberg*, 457 U.S. at 315.

43

to provide it, *is a right which must be made available to all on equal terms.*" 347 U.S. at 493 (emphasis added). The Court expanded on this fundamental principle in *Plyler.* There, the Court confronted the functional exclusion of a discrete group of children from Texas's statewide education system. Under Texas law, immigrant children who could not establish that they had been legally admitted into the United States were denied a free education in public schools, and could attend only if they could afford to "pay a 'full tuition fee' in order to enroll." *Id.* at 206 & n.2. Because many could not afford to pay tuition, the law amounted in practice to the "exclusion" by the state "of undocumented children from its public schools." *Id.* at 208.

The Court held this functional exclusion invalid. Because "education has a fundamental role in maintaining the fabric of our society,…[w]e cannot ignore the significant social costs borne by our Nation when *select groups are denied the means to absorb the values and skills upon which our social order rests.*" *Id.* (emphasis added). In particular, the *Plyler* Court emphasized the significance of literacy, recognizing that Texas's failure to provide undocumented children with access to literacy was antithetical to "one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit." 457 U.S. at 221–22. "Illiteracy is an enduring disability. The inability to read and write will handicap the

44

individual deprived of a basic education each and every day of his life." *Id.* at 222.

The State's withholding of access to literacy would "impose[] a lifetime hardship"

on these children, and thereby "foreclose the means by which that group might

raise the level of esteem in which it is held by the majority," resigning them to a

permanent underclass. *Id.* at 222–23.

>   In the Court's words:

>> The *stigma of illiteracy* will mark them for the rest of
>> their lives. By denying these children a basic education,
>> we deny them the ability to live within the structure of
>> our civic institutions, and foreclose any realistic
>> possibility that they will contribute in even the smallest
>> way to the progress of our Nation.

*Id.* at 223 (emphasis added). This result, the Court held, could not be reconciled

"with the framework of equality embodied in the Equal Protection Clause." *Id.* at

222. The Court thus held that the legislation could not be upheld "unless it furthers

some substantial goal of the State"—which the Court held it did not. *Id.* at 224.

### 2.　Plaintiffs Have Been Excluded from the Statewide System of Education That Defendants Control.

Like the Texas system at issue in *Plyler*, the Michigan system functionally

excludes Plaintiffs—a group of almost entirely low-income children of color—

from the opportunity to attain literacy. As in *Plyler*, the schoolhouse doors are

nominally open to Plaintiffs. But also as in *Plyler*, Defendants have imposed an

insuperable obstacle to attaining access to a basic education. In *Plyler*, the

45

requirement of tuition functionally kept plaintiffs from accessing a basic education. Here, Michigan's failure to provide Plaintiffs with the essential elements that a school must include to offer access to literacy—teachers, books, sanitary physical conditions—means Plaintiffs are just as excluded from access to a basic education as if the State had locked them outside the schoolhouse gates. Whether inside or outside what Michigan is offering as "schools," Plaintiffs' opportunity to attain literacy is the same—zero.

The Complaint details how the State has functionally excluded Plaintiffs from the access to literacy that it provides to other students. (Complaint, RE.1, PageID#10, 55–57, 76–80 (curriculum); PageID#13–16, 78–80, 101–02 (teachers); PageID#8–11, 56–57, 81–86 (books and instructional materials); PageID#60–62, 107–10 (school closures); PageID#14–15, 98–99, 101–02 (unaddressed trauma); PageID#15, 80–81, 99–101 (lack of English Learner instruction). Moreover, the unsafe conditions of Plaintiffs' schools create further substantial obstacles to the acquisition of literacy. (*Id.* at PageID#12–14, 80–81, 87, 90–92 (extreme temperatures); PageID#12–13, 57, 80–81, 88–89, 93 (vermin); PageID#12–13, 57, 87, 92–97 (dangerous building conditions).)

State and national achievement data consistently reveal that Detroit students are the least literate in the nation, at the very bottom. Proficiency rates in Plaintiffs' schools hover near ***zero***. (*Id.* at PageID#8–9, 62–71.) In 2015-16, for

46

example, not a single sixth-grader at Hamilton scored proficient on Michigan's state achievement tests in English. (*Id.* at PageID#67–68.)  At Experiencia, the sixth-grade English proficiency rate was only 3.7%.  (*Id.*)  By comparison, the average sixth-grade English proficiency rate statewide—an average that is pulled down by the results from Plaintiffs' schools—was 45%.  (*Id.*)  Similarly, for eleventh-graders, the English proficiency rate at Osborn MST was only 1.9% in the 2014-15 school year, while statewide the average English proficiency rate was 49.2%.  (*Id.* at PageID#9–10, 68.)  As the statewide average numbers show, Defendants have the capacity to ensure that students have access to literacy, and do so in schools across the State.  But in Plaintiffs' schools, essentially the entire student body fails to achieve proficiency—which confirms that these are "schools" in name only, and that the State's educational system is therefore excluding Plaintiffs from equal access to a basic education at least as thoroughly—if not more so—than if Michigan had chosen instead to charge them tuition.

By denying Plaintiffs access to schools that offer an opportunity to attain literacy, Defendants have effectively consigned Plaintiffs and others at their schools to life in a permanent underclass.  Like the students in *Plyler*, Plaintiffs are subject to the "enduring disability" of "illiteracy," and "[t]he inestimable toll of that deprivation on [their] social[,] economic, intellectual, and psychological well-being" will affect them "each and every day" of their lives.  457 U.S. at 221–22.

47

### B.     The Proper Comparison Class Is Other Students Who Are Compelled to Participate in the Statewide System of Education.

Despite the plain inequality between Defendants' treatment of Plaintiffs, who are denied access to literacy, and children who attend other schools in the statewide system of education that Defendants control and who are provided with access to literacy (and much more), the district court held that Plaintiffs failed to state a claim under the Equal Protection Clause because, in the court's view, "Michigan schools as a whole are not the proper comparator" to Plaintiffs' schools. (Opinion, RE.117, PageID#2821.)  Instead, the court said, "Defendants are the proper parties in this case specifically because of the State's involvement in Detroit schools pursuant to Michigan law[s]" authorizing the appointment of an emergency manager and the designation of Priority Schools for supervision by the SRO.  (*Id.*)  According to the court, "[t]he appropriate comparators for an equal-protection claim are, therefore, other Michigan schools that have come under the control of emergency managers, been designated a Priority School, or were governed by the EAA."  (*Id.*)

This ruling was error, and fundamentally misconstrued Plaintiffs' equal protection claim.  Plaintiffs do not claim that other schools were better supervised by emergency managers or received better treatment by the SRO than they did.  To the contrary, Plaintiffs' claim is that Defendants, who are responsible under State

law for overseeing the statewide system of education, administer the State laws that govern that system in a manner that denies Plaintiffs access to literacy.

As the Complaint makes clear, Defendants are broadly responsible for managing the statewide system of education.  (*See* Complaint, RE.1, PageID#47–50.)  State law administered by Defendants determines what funding schools throughout the State will have to educate their students.  (*Id.* at PageID#49–50.) State law also controls who may teach students throughout the State, providing that students throughout the State *except in Detroit* must be taught by certificated teachers.  (*Id.* at PageID#16, 59–60.)

Here, the State has exercised its comprehensive power over the statewide system of education to separately classify a discrete and isolated minority of students—namely, Plaintiffs and other students in their schools—to receive an "education" that does not give them the opportunity to acquire basic minimal skills, unlike other students throughout the State.  (*See, e.g.*, Complaint, RE.1, PageID#4–5, 17–19, 59, 62.)  While the State has ensured adequate resources and properly certificated teachers in other schools sufficient to provide students with access to literacy, it has made no such provision for Plaintiffs' schools—instead allowing those schools to deteriorate to the point of providing no meaningful education at all.  By taking direct control of Plaintiffs' schools through appointment of an emergency manager and the supervision of the SRO,

Defendants have directly brought about those schools' decline.  (*See id.* at

PageID#52–62.)  Defendants' particular actions and inactions—both in managing

the statewide system and in directly managing Plaintiffs' schools—have caused

Plaintiffs' deprivation of the access to literacy that is provided to other students

throughout the statewide system of education.  (*See, e.g.*, *id*.)  The proper

comparison, therefore, is to those other students who participate in the statewide

system of education, but to whom access to literacy is provided.

In rejecting Plaintiffs' claim, the district court focused exclusively on State

laws that authorize Defendants to take *further* control of particular schools and

school districts:  the emergency manager statute, the SRO statute, and the

agreement authorizing the EAA.  (Opinion, RE.117, PageID#2821, 2789–92.)

According to the district court, these laws "put the State in a different posture with

respect to distressed schools than schools that have not required intervention," and

thus make other schools improper comparators.  (*Id.* at PageID#2821.)  But other

schools in the statewide system are not in a "different posture" from Plaintiffs'

schools—all are subject to the State's ultimate authority, including the State's

authority to appoint an emergency manager or designate Priority Schools where it

chooses to do so.  In some schools and school districts the State intervenes under

these laws, while in others it does not—but for all schools, the State is ultimately

responsible under State law for the education provided to students compelled by

50

State law to participate in its system.  (*Id.* at PageID#2788–89.)  Here, Plaintiffs'

claim is that Defendants exercised their ultimate authority with respect to

Plaintiffs' schools so as to exclude Plaintiffs from the access to literacy that other

students receive.  (Complaint, RE.1, PageID#52–62.)  As such, other students

compelled to participate in the statewide system of education overseen by

Defendants are the proper comparators to Plaintiffs.

### C.    Michigan's Actions Fail Any Level of Scrutiny Because There Can Be No State Interest Sufficient to Deny a Discrete Group of Students Access to Literacy.

#### 1.    Defendants' Actions Do Not Satisfy Heightened Scrutiny.

The Supreme Court in *Plyler* held that a State classification that excludes

certain students from the statewide system of education warrants a heightened form

of scrutiny.  457 U.S. at 217–18, 223–24.  Unlike other legislative classifications

that are permissible if they "bear[] some fair relationship to a legitimate public

purpose," a classification that excludes students from education "can hardly be

considered rational unless it furthers some *substantial* goal of the state."  *Id.* at

216–18, 224 (emphasis added).[5]  Defendants cannot establish any such

"substantial" interest in depriving Plaintiffs of access to literacy.  Indeed, as *Plyler*

makes clear, there can be no legitimate governmental interest served by the

---

[5] The district court ignored the *Plyler* Court's statement that a classification that excludes children from any education must further a *substantial* state interest, declaring without discussion that the statute in *Plyler* "did not survive rational-basis review."  (Opinion, RE.117, PageID#2823.)

stigmatic denial to any disfavored group of access to literacy within a State's public school system.  457 U.S. at 223.

The district court declined to apply *Plyler*, because it said the "mechanics of the two cases" were different.  (Opinion, RE.117, PageID#2823.)  But *Plyler* cannot be distinguished from this case on the ground that it involved a statutory classification.  Plaintiffs and their fellow students are classified into schools within the statewide system of education.  Even if Defendants have not identified in any statute those schools in which no access to literacy will be provided, they operate a system in which most schools *do* provide access to literacy, and some do not—and that classification equally violates Plaintiffs' rights under the Equal Protection Clause.

Both *Rodriguez* and *Plyler* emphasize the practical effect of depriving children of the "opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process," *Rodriguez*, 411 U.S. at 37—namely, the creation of a permanent underclass that is deprived of "the means by which that group might raise the level of esteem in which it is held by the majority," *Plyler*, 457 U.S. at 222.  These statements apply just as squarely to the situation Plaintiffs face here:  the State has ostensibly opened the doors to the schoolhouse, but nonetheless denied Plaintiffs any meaningful opportunity to acquire basic skills.  *See Rodriguez*, 411 U.S. at 37.

52

Simply put, permitting students to enter a school building, but failing to educate them once they are inside, is no different from barring their entry absent payment of tuition—and Defendants' actions fail the Equal Protection Clause just as Texas's actions did in *Plyler*.

If anything, the violation of Plaintiffs' rights is more egregious. The Court in *Plyler* recognized that the excluded children's "undocumented status [was] not irrelevant to any proper legislative goal," and noted the district court's finding that "the immigration of Mexican nationals into the United States had created problems for the public schools of the State, and that these problems were exacerbated by the special educational needs of immigrant Mexican children." 457 U.S. at 207, 220. Even so, Texas's action—which "impose[d] its discriminatory burden on the basis of a legal characteristic over which children can have little control"—could not withstand scrutiny. *Id.* at 220. As the Court explained, "[t]his situation raises the specter of a permanent caste of undocumented resident aliens…denied the benefits that our society makes available to citizens and lawful residents. The existence of such an underclass presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law." *Id.* at 218–19.

Here, Plaintiffs are overwhelmingly American citizens, and likewise children who have no control over which public schools they are assigned to. Plaintiffs, like the undocumented resident aliens at issue in *Plyler*, are being

relegated to a permanent underclass, presenting the same "difficult problems" of inequality that required invalidation of Texas's law in *Plyler*. The treatment of Plaintiffs evokes our nation's long and shameful history of using the denial of access to literacy to subjugate people of color, like Plaintiffs and the overwhelming majority of students in their schools. *See, e.g.*, *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 371–72 (1978) (Brennan, J., concurring in part and dissenting in part) (describing laws that criminalized teaching enslaved African-Americans to read); *S.C. v. Katzenbach*, 383 U.S. 301, 310–12 (1966) (noting that, because of these prior criminal laws, a huge gap in literacy rates between African-Americans and Caucasians persisted long after the Thirteenth and Fourteenth Amendments were ratified). The *Plyler* children's status as undocumented resident aliens was not enough to support the discriminatory effects of Texas's law—and the Defendants' imposition of a "discriminatory burden" on Plaintiffs lacks even that justification.

### 2.    Defendants' Actions Do Not Satisfy Rational Basis Review.

Even if rational basis review applied, Defendants' conduct would not withstand scrutiny. Defendants do not claim to have a direct interest in depriving children attending certain schools within the statewide education system of access to literacy, and for good reason: there is no interest that could justify the conditions present in Plaintiffs' schools.

Although the district court did not purport to identify any rational basis for excluding Plaintiffs from the statewide system of education, the court held that Plaintiffs had failed to plead sufficient facts to establish the irrationality of Defendants' actions. According to the district court, "the Complaint fails to provide a concrete example" of any irrational action by Defendants, and thus does not satisfy the pleading requirements of *Iqbal*, 556 U.S. at 678. (Opinion, RE.117, PageID#2823.) But this conclusion cannot be reconciled with the district court's own analysis of the role that Defendants played in Plaintiffs' schools.

In the district court's words, "there is no question that the State has been heavily involved with Detroit schools for some time," and the State Defendants "effectively control the schools." (*Id.* at PageID#2792, 2796.) During the time that the State "effectively controlled" Plaintiffs' schools, State Defendants and their agents made a series of choices—not providing textbooks, not providing teachers, not providing safe conditions—that actively deprived Plaintiffs and other students in Detroit of access to literacy. As the Complaint alleges, "[t]he State's period of control has been marked by decisions affecting the education of minority children that would never be permitted in predominantly white school districts." (Complaint, RE.1, PageID#53.) Contrary to the district court opinion, many of these irrational decisions are detailed in the Complaint. (*See, e.g.*, *id.* at PageID#55–57 ("From the outset of State control, the State failed to provide

55

[Marion Law Academy] appropriate teaching support, staffing, resources, and school conditions that would permit the teachers to deliver literacy to students,"…and "ignored specific requests by teachers for support in providing literacy instruction to struggling first-graders"); PageID#78–79 (while Hamilton was under State control in the 2015-16 school year, staff there "were not trained to deliver literacy intervention or remediation, and no additional classroom support was provided" even though many students entering the fourth grade that year had only a kindergarten-level vocabulary); PageID#82–83 (while Osborn MST was under State control, a U.S. History class was permitted to proceed with "only 5 textbooks for a class of 28 students," while "an economics teacher had 25 textbooks for 118 students").)

The district court stated that it "accept[ed] as true the Complaint's factual allegations" that these conditions existed in Plaintiffs' schools while those schools were under the control of the State Defendants, but the court nonetheless declared the allegations to be "'merely consistent with' Defendants' liability." (Opinion, RE.117, PageID#2823.) The court's analysis, however, does not account for the State's plenary authority in Plaintiffs' schools. In the years described in the Complaint—during which the State was responsible for operating the schools— there is *no one else* who could have caused Plaintiffs to be excluded from access to literacy. It is therefore necessarily the State Defendants' actions that caused

56

Plaintiffs to be deprived of access to literacy even while other participants in the statewide system of education were granted far superior educational opportunities. No rational basis could support such a State action.

Finally, even if this Court were to agree that the Complaint did not allege sufficient "concrete example[s]" of irrational actions by the State Defendants, it should reverse the district court's dismissal of the Complaint with prejudice. This was error, as amendment would not have been futile. *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962). Although Plaintiffs do not believe it necessary, they could have identified further "concrete examples" of improper action by Defendants—and therefore, at a minimum, Plaintiffs should have been granted an opportunity to amend the Complaint.

## CONCLUSION

For the foregoing reasons, the decision should be reversed.

Dated:  November 16, 2018                    Respectfully submitted,

                                             */s/ Tacy F. Flint*
                                             Mark D. Rosenbaum
                                             Anne Hudson-Price
                                             Kathryn A. Eidmann
                                             PUBLIC COUNSEL
                                             610 South Ardmore Avenue
                                             Los Angeles, CA 90005
                                             (213) 385-2977
                                             mrosenbaum@publiccounsel.org
                                             aprice@publiccounsel.org
                                             keidmann@publiccounsel.org

                                             Tacy F. Flint
                                             Lawrence P. Fogel
                                             Suzanne Brindise Notton
                                             Jennifer M. Wheeler
                                             SIDLEY AUSTIN LLP
                                             One South Dearborn
                                             Chicago, IL 60603
                                             (312) 853-7000
                                             tflint@sidley.com
                                             lawrence.fogel@sidley.com
                                             snotton@sidley.com
                                             jwheeler@sidley.com

                                             Carter G. Phillips
                                             SIDLEY AUSTIN LLP
                                             1501 K Street, N.W.
                                             Washington, D.C. 20005
                                             (202) 736-8000
                                             cphillips@sidley.com

Joshua E. Anderson
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000
janderson@sidley.com

Mark E. Haddad
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000
mhaddad@law.usc.edu

Bruce A. Miller
MILLER COHEN, PLC
600 West Lafayette Blvd., 4th Floor
Detroit, MI 49226
(313) 964-4454
brucemiller@millercohen.com

Evan H. Caminker
University of Michigan Law School
625 South State Street, 3250 South Hall
Ann Arbor, MI 48109
(734) 763-5221
caminker@umich.edu

*Attorneys for Appellants*

59

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because, according to the word-count feature of Microsoft Word, this brief contains 12,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14 point font.

Dated:  November 16, 2018                    Respectfully submitted,

/s/ *Tacy F. Flint*
Tacy F. Flint
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
tflint@sidley.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2018, I electronically filed the

foregoing paper with the Clerk of the Court using the ECF filing system, which

will send notifications to the following counsel of record:

Joshua S. Smith
Michigan Department of Attorney General
Health Education and Family Services
525 W. Ottawa St., 3rd Floor
P.O. Box 30758
Lansing, MI 48909
517-373-7700
SmithJ46@michigan.gov

Toni L. Harris
Michigan Department of Attorney General
525 W. Ottawa St., 3rd Floor
P.O. Box 30758
Lansing, MI 48909
517-373-7700
HarrisT19@michigan.gov

Jonathan S. Ludwig
Michigan Department of Attorney General
Health Education and Family Services
525 W. Ottawa St., 3rd Floor
P.O. Box 30758
Lansing, MI 48909
517-373-7700
LudwigJ1@michigan.gov

Respectfully submitted,

*/s/ **Tacy F. Flint***
Tacy F. Flint

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RE # | Description | Date | Page ID# Range |
|------|-------------|------|----------------|
| 1 | Class Action Complaint | 09/13/2016 | 1-136 |
| 60 | Defendants' Motion to Dismiss | 11/17/2016 | 479-1358 |
| 64 | Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss | 01/12/2017 | 1398-1456 |
| 96 | Defendants' Reply in Support of Defendants' Motion to Dismiss | 02/02/2017 | 1847-1924 |
| 108 | Notice of Supplemental Authority in Support of Plaintiffs' Response to Defendants' Motion to Dismiss | 08/04/2017 | 2531-2548 |
| 109 | Transcript of Motion to Dismiss Hearing | 08/18/2017 | 2549-2598 |
| 110 | Notice of Supplemental Authority in Support of Defendants' Motion to Dismiss | 08/29/2017 | 2599-2710 |
| 111 | Plaintiffs' Response to Defendants' Notice of Supplemental Authority | 09/08/2017 | 2711-2737 |
| 112 | Opinion and Order Granting Defendants' Motion to Dismiss | 06/29/2018 | 2738-2777 |
| 113 | Judgment | 06/29/2018 | 2778 |
| 114 | Notice of Appeal | 07/26/2018 | 2779-2781 |
| 116 | Notice of Correction | 07/27/2018 | 2784 |
| 117 | Opinion and Order Granting Defendants' Motion to Dismiss (Corrected) | 07/27/2018 | 2785-2824 |
| 118 | Amended Notice of Appeal | 07/30/2018 | 2825-2828 |