Nos. 18-1855/18-1871

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

GARY B.; JESSIE K., a minor, by Yvette K., guardian ad litem; CRISTOPHER R., a minor, by Escarle R., guardian ad litem; ISAIAS R., a minor, by Escarle R., guardian ad litem; ESMERALDA V., a minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor, by Karen R., guardian ad litem,

Plaintiffs-Appellants,

v.

RICHARD D. SNYDER, Governor; JOHN C. AUSTIN, member of MI Bd of Education; MICHELLE FECTEAU, member of the MI Bd of Education; LUPE RAMOS-MONTIGNY, member of the MI Bd of Education; PAMELA PUGH, member of the MI Bd of Education; KATHLEEN N. STRAUS, member of the MI Bd of Education; CASANDRA E. ULBRICH, member of the MI Bd of Education; EILEEN WEISER, member of the MI Bd of Education; RICHARD ZEILE, member of the MI Bd of Education; BRIAN J. WHISTON, Superintendent of Public Instruction for the State of MI; DAVID B. BEHEN, Director of the MI Dept of Technology; NATASHA BAKER, State School Reform/Redesign Officer, in their official capacities,

Defendants-Appellees.

On Appeal
from the United States District Court for the Eastern District of Michigan

## AMICUS CURIAE BRIEF
## OF THE AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN
## IN SUPPORT OF APPELLANTS AND REVERSAL

Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824

This brief principally drafted by:

Peter J. Hammer, Professor of Law
471 W. Palmer St.
Detroit, MI 48202
(313) 577-0830

ii

## CORPORATE DISCLOSURE

Amicus curiae American Civil Liberties Union of Michigan (1) is not a subsidiary or affiliate of any publicly owned corporation, and (2) knows of no publicly owned corporation, not a party to this appeal, that has a financial interest in its outcome.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE ................................................................. iii

TABLE OF AUTHORITIES ..................................................................vi

INTEREST OF AMICUS CURIAE ..........................................................1

RULE 29(a)(4)(E) STATEMENT .............................................................2

INTRODUCTION .....................................................................................3

ARGUMENT .............................................................................................4

I.    State of Michigan Policies Systematically Deny Literacy to Detroit's Children, While Broken Political Processes Prevent Any Meaningful Change......................................................................................................4

A.    Detroit Schools Are Mired in the Morass of Spatial Racism. ........................4

B.    State of Michigan Policies Systematically Deny Literacy to Detroit's Children. .......................................................................................7

C.    Broken Political Processes Prevent Any Meaningful Chance to Afford Detroit's Children Basic Literacy Rights. ...................................................10

1.    Michigan Courts Have Declared That There Is No State Constitutional Protection for the Denial of Literacy Rights. ..............11

2.    State-Imposed Emergency Management and the Education Achievement Authority Have Made Educational Problems Much Worse, Not Better. ...................................................12

3.    The State Legislature Rejected Core Reforms That Would Have Addressed Structural Problems of School Finance, Choice and Governance.......................................................15

II.   The Denial of Literacy Rights to Detroit's Children Is the Latest Iteration of Cycles of Oppression Across Time, from Prohibitions Against Slaves Learning to Read, to Attacks on Schools and Teachers During

Reconstruction, to the Separate and Unequal Schools Flowing from *Plessy v. Ferguson*. ..................................................................................................17

A.    Systems of Racial Hierarchy Do Not Just End, They Reproduce
       Themselves Over Time. .................................................................................17

B.    The Denial of Literacy Rights Is a Principal Mechanism in America
       for Political and Economic Oppression. .......................................................18

    1. Prohibitions Against Literacy Reinforced Slavery. .....................................18

    2.    White Vigilantes and State Actors Physically Attacked Teachers
           and Burned Schools During the Reconstruction Era. .........................19

    3.    Post-Reconstruction, the Denial of Literacy Rights Became a
           Matter of Affirmative State Policy, Not Just Vigilante Violence. .......23

C.    Oppression Has Moved from Systems of Jim Crow Segregation in the
       South to Systems of Spatial Racism in the North and from *Cumming*
       to *Gary B*. .....................................................................................................26

CONCLUSION ...............................................................................................................29

APPENDIX ON SPATIAL RACISM……………………………………………........32

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954)....................25, 27, 28

*LM v. State*, 862 N.W.2d 246 (Mich. Ct. App. 2014).......................................... 1, 11

*Milliken v. Bradley*, 418 U.S. 717 (1974)...........................................................6, 27

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ...............................................................3

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971) ......................... 6

*Washington v. Glucksberg*, 521 U.S. 702 (1997) .....................................................18

**Other Authorities**

April Van Buren, *After Six Years, Education Achievement Authority Leaves Behind Lackluster Legacy*, Michigan Radio, June 26, 2017 ....................14

Coalition for the Future of Detroit Schoolchildren, *The Choice Is Ours* (2015) ...............................................................................................................8, 15

College of Education Council, Eastern Michigan University, Memorandum, *Review of EMU's Interlocal Agreement with the School District of the City of Detroit* 3, Dec. 2, 2015. .........................................14

David Herbert Donald, *Charles Sumner, Parts I & II* (1996) ................................22

Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (2002) ................................................................................................21

Frederick Douglass, *Narrative of the Life of Frederick Douglass: An American Slave* 364, *in* Henry Louis Gates, Jr., ed.*, The Classic Slave Narratives* (1987) ...................................................................................19

J. Morgan Kousser, *Separate but not Equal: The Supreme Court's First Decision on Racial Discrimination in Schools*, 46 J.S. Hist. 17 (1980) .............................................................................................................24, 26

James D. Anderson, *The Education of Blacks in the South, 1860-1935* (1988)........................................................................................24, 25, 26

Lou Falkner Williams, *The Great South Carolina Ku Klux Klan Trials, 1871-1872* (2004)................................................................................21

Thomas C. Pedroni, *MEAP Cohort Data Reveal Stagnation and Decline in EEA Student Test Achievement*, Detroit Data and *Democracy Project*, Mar. 3, 2014 ................................................................. 13, 14

W.E.B. Du Bois, *Black Reconstruction in America* (1992)...............................19, 20

## INTEREST OF AMICUS CURIAE

The American Civil Liberties Union of Michigan ("ACLU") is the Michigan affiliate of a nonpartisan nonprofit membership organization with more than 1.75 million members dedicated to protecting rights guaranteed by the United States Constitution. The ACLU regularly files amicus curiae briefs on constitutional questions pending before this and other courts.

The ACLU has long been committed to protecting the right to a quality education in our public schools, including through its litigation of a similar action in state court, dubbed the "right to read" case, regarding access to literacy in the public schools of Highland Park, Michigan. *See LM v. State*, 862 N.W.2d 246 (Mich. Ct. App. 2014). In this case, the ACLU offers an amicus curiae brief, authored principally by a prominent legal scholar, which provides historical and political context to the dispute before the Court. The ACLU believes that this Court's analysis of the constitutional questions presented will be strengthened by a proper understanding of the context in which these questions arise.

## RULE 29(a)(4)(E) STATEMENT

No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

It is no accident that the denial of the right to literacy detailed in the Complaint in this case is taking place in a city like Detroit. The purpose of this amicus brief is to provide the Court with historical and political context for why the Detroit schools have failed plaintiffs and why court intervention is critical to ensuring that future generations of Detroit youth learn to read.

The denial of basic literacy rights to the children of Detroit is deeply grounded in history. Systems like slavery do not just end, they reproduce themselves over time. As such, in a very real sense, the denial of literacy to Detroit children is connected to the separate and unequal institutions of *Plessy v. Ferguson*, 163 U.S. 537 (1896), the burning of schools in the Reconstruction Era and prohibitions against teaching slaves to read.

This amicus brief first situates the denial of literacy rights to Detroit children within the context of the geographic segregation of race and opportunity, as well as systemic failures in state education policy that are perpetuated by broken political processes. The brief then links the denial of literacy rights to Detroit's children across time to the interrelated, systematic denials of education in American history, particularly for African Americans, as a tool of political and economic oppression.

**ARGUMENT**

**I.    State of Michigan Policies Systematically Deny Literacy to Detroit's Children, While Broken Political Processes Prevent Any Meaningful Change.**

**A.  Detroit Schools Are Mired in the Morass of Spatial Racism.**

The Complaint in this case details the complete breakdown of education systems and the denial of basic literacy rights to Detroit's children. To begin to understand the dysfunctional schools described in the Complaint, it is necessary to understand the role that spatial racism has played in Detroit. Spatial racism defines the near complete segregation of race, wealth and opportunity in Southeast Michigan.[1]

If one were looking from outer space at Southeast Michigan and could observe only the presence or absence of opportunity, the geopolitical boundaries of Detroit could be seen from space as an opportunity desert. This opportunity desert exists within a rich sea of opportunity that defines the majority of the region. (*See* Appendix A-1).[2] If one maps the demographics of race over opportunity, one finds the near complete segregation of race, wealth and opportunity in Southeast

---

[1] Peter J. Hammer, *Race, Regionalism and Reconciliation: Detroit Planning Fails the Three Rs*, Progressive Planning 4 (Fall 2015).

[2] Jason Reece & Christy Roger, *Opportunity for All: Inequality, Linked Fate and Social Justice in Detroit and Michigan* 21 (2008).

Michigan, defining the terrains of contemporary spatial racism in the region. (*See* Appendix A-2).[3]

Patterns of spatial racism do not arise overnight. Spatial racism has been the result of a seventy-year dynamic process where segregated spaces inside the city, like Black Bottom and Paradise Valley, were transformed into a regional system where entire cities like Detroit, Pontiac and Flint now serve as today's segregated spaces.

A critical aspect of the physics of spatial racism is the rigidity of municipal boundaries. Municipal boundaries in Michigan, unlike states like North Carolina, are very rigid. Detroit's boundaries have not changed since 1926. As such, once someone crosses Eight Mile Road in Detroit, one is in a completely different universe, governed by completely different social and political rules. In contrast, the city of Charlotte, North Carolina, has been able to change its boundaries over time in response to white flight and urban sprawl.[4] This has not ended racism in Charlotte by any means, but it substantially changes the social, political and

---

[3] *Id*. at 22.

[4] David Rusk, *Changing the "Rules of the Game": Tools to Revive Michigan's Fractured Metropolitan Region*, 13 J.L. Soc'y 197, 217 tbl 2 (2011) (demonstrating how the square mileage of Charlotte has increased nearly ten times from 30 to 297.7 square miles between 1950-2010).

economic dynamics in which racial tensions are addressed. It also forestalls the production and reproduction of spatial racism.

The ability to change municipal boundaries can have significant implications for the boundaries of school districts as well. The school districts for the expanding city of Charlotte and for the surrounding Mecklenburg County were consolidated into a single entity. As such, when federal courts found intentional discrimination in the Charlotte-Mecklenburg School District, it could implement an effective intra-district bussing plan as a remedy. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971).

Detroit was a completely different story. Southeast Michigan was well on the path to spatial racism when federal courts found unconstitutional discrimination in the Detroit school system. *Milliken v. Bradley*, 418 U.S. 717 (1974). Given the racially Balkanized nature of the region, however, it was not possible for intra-district bussing to remedy the problem. As such, the district court ordered a system of inter-district bussing. Ironically, a system of inter-district bussing in Detroit was functionally equivalent to the system of intra-district bussing ordered in Charlotte, if Detroit could have expanded its own boundaries in light of the currents of expanding white flight and urban sprawl.

Justice Stewart blamed allegedly "unknown and perhaps unknowable factors" for the racial segregation in the Detroit Metropolitan area. *Milliken*, 418

6

U.S. at 756 n.2 (Stewart, J. concurring). This is not correct. The forces of spatial racism were and are knowable. Moreover, court decisions have consequences; they can make the dynamics of spatial racism more or less harmful. Schools and housing are the most important forces shaping racial boundaries. *Milliken* was the last best chance Detroit had in muting the forces of spatial racism. The desperate shape of education in Detroit today, as documented in the Complaint in this case, is in no small way traceable directly back to *Milliken*.

### B. State of Michigan Policies Systematically Deny Literacy to Detroit's Children.

Ultimately, state policies lie at the heart of the education failure in Detroit. At its most simple level, there are deep structural flaws in state laws governing school finance, school choice and school governance.[5] The operating revenue a school receives is the sum of its designated school allowance times the number of children in the school. Significantly, all of the dollars follow the student. When the student leaves the school or the district, the school loses all of the operating revenue associated with the student. (Anyone trained in basic economics can already start to anticipate the tremendous dysfunction caused by an incentive structure driven by average rather than marginal costs.)

---

[5] Peter J. Hammer, *The Fate of the Detroit Public Schools: Governance, Finance and Competition*, 13 J.L. Soc'y 111, 120-30 (2011).

The problems latent in this system can be masked so long as student enrollment is increasing. The problems, however, become obvious when enrollments decline. This creates a zero-sum game where every student captured by one school triggers a direct loss to another school.

Michigan has some of the most aggressive school choice policies in the country. The state has an expansive policy of inter-district schools of choice for public school districts. Michigan also has an aggressive charter school policy. There are twelve separate bodies authorizing charter schools in Detroit that act completely independent of each other. This means that virtually anyone can open a charter school in Detroit, with no independent assessment of need, quality or location.

The bipartisan Coalition for the Future of Detroit School children, which marked one of the most important collective efforts of organized civil society in Detroit in the past four decades and represents Republicans, Democrats, business, community, traditional and charter schools, parents and unions, has carefully documented the substantial decline in Detroit Public Schools' enrollment due to losses of population, inter-district schools of choice and the explosion of charter schools. [6] Population losses are directly fueled by the same forces underlying spatial racism and its consequences. The number of children attending schools in

---

[6] Coalition for the Future of Detroit Schoolchildren, *The Choice Is Ours* (2015).

Detroit dropped from 196,638 to 119,658 between 2002 and 2013. During that same period, the percentage of students attending Detroit Public Schools fell remarkably from 85% to 42%.[7]

The results are economically devastating for Detroit Public Schools. The loss of each child from the city and the further loss of each child to an alternative school is a loss of the average operating revenue associated with that student. The district is forced into a downward spiral where it must cut its expenses faster than its revenues fall. As anyone who understands fixed costs knows, this is an impossible task.

State policies have created chaos and dysfunction in Detroit. "Since 2000, more than 230 Detroit Schools have been closed or reconfigured, impacting about 75,000 students and their families."[8] The impact on students, teachers and administrators can be seen in the failed state of education and the denial of literacy rights detailed in the Complaint in this case.

These results are not unintended. Charter schools act like opportunistic infections. They do not attack healthy public school systems, because they cannot compete under those conditions. Charter schools attack distressed school systems and exacerbate their distress. These results are not accidental; they inevitably flow

---

[7] *Id*. at 19.

[8] *Id.* at 11.

from dysfunctional state policy. At some point, if a responsible government actor fails to act when the results of such inaction are known, they can be charged with intending the outcome.[9]

### C. Broken Political Processes Prevent Any Meaningful Chance to Afford Detroit's Children Basic Literacy Rights.

An important assumption latent in most federal education policy is that states are generally in an adequate position to provide sufficient education for their citizens. This further assumes sufficiently well-functioning political processes within each state. These assumptions may work acceptably well when the children in question are the literal and figurative children of the legislators making policy decisions. Spatial racism critically undermines this assumption. As the Flint Water Crisis and the denial of education rights detailed in the present case teach us, all sorts of atrocities are possible in the State of Michigan. Michigan's political processes are completely unresponsive when the children in crisis are not the children of state legislators.

Ordinarily, one would instruct the plaintiffs in this case to seek redress in the state courts, or from the state executive, or from the state legislature. In truth,

---

[9] Hammer, *supra* note 5, at 148-49 ("If the state simply intended, *sub rosa*, to legislate the elimination of traditional public schools in Detroit, it could hardly think of a more effective vehicle to accomplish the objective.").

representatives of the plaintiffs' interests have done just that, and the State's doors have been slammed in their face in each instance.

In light of these failed political processes, there is no recourse other than the present federal litigation.

### 1. Michigan Courts Have Declared That There Is No State Constitutional Protection for the Denial of Literacy Rights.

Highland Park, Michigan, is literally a city inside the city of Detroit, subject to the same dynamics of spatial racism as Detroit and further illustrating how impossible it is to change municipal boundaries in Michigan.

In *LM v. State*, 862 N.W.2d 246 (Mich. Ct. App. 2014), the plaintiffs pled deficiencies in the Highland Park education system were as devastating as those detailed in the present case. Relying on what it interpreted as established Michigan law, the Michigan Court of Appeals rejected all statutory and state constitutional claims. No matter how dysfunctional the education system was and what basic literacy rights were denied, there would be no judicial recourse. "Plaintiffs do not have a direct cause of action arising under the Michigan Constitution." *Id.* at 253.

Furthermore, the court made it clear that Michigan courts would play no role in ensuring that children could actually learn anything.

> [T]he Michigan Constitution require[s] only that the Legislature provide for and finance a system of free public schools. The Michigan Constitution leaves the actual intricacies of the delivery of specific educational services to the local school districts. We conclude that

11

> plaintiffs have not stated a claim or cause of action arising directly under the Michigan Constitution.

*Id.* The door to the state courthouse is closed to these plaintiffs.

### 2. State-Imposed Emergency Management and the Education Achievement Authority Have Made Educational Problems Much Worse, Not Better.

The problems of the Emergency Management of the Detroit Public Schools are legion. Attention will focus here primarily on financial debt for two reasons. First, financial health is the metric the state provided for judging its own success. Second, the failed policy diagnosis that Emergency Management was the proper remedy for the educational crisis in Detroit further documents the inability or unwillingness of the state to address the root causes of dysfunctional state finance, choice and governance policies that are the actual structural causes of the problem.

When the Emergency Manager took control of DPS in 2009, DPS's total operating debt was about $400 million.[10] By 2016, with seven years under Emergency Management, the operating deficit had exploded to $1.9 billion, with a total combined deficit of over $3.5 billion dollars.[11] The per student annual cost associated with paying off this operating debt alone had grown to $3,019, meaning that more than three thousand dollars was taken off the top of the $7,296 per

---

[10] Abby Jackson, *Here Is What Led Up to Those Disturbing Images of Mold, Mushrooms, and Bullet Holes in Detroit's Schools*, Bus. Insider, Jan. 22, 2016.

[11] Ann Zaniewski, *Report: DPS Owes $3.5 Billion; Out of Cash by April?,* Det. Free Press, Jan 6, 2016.

student allowance intended to educate each child, just to pay for failed state finance, choice and governance policies.[12]

State performance was no better when it ostensibly tried to improve education, rather than finance. This is the story of the Education Achievement Authority (EAA). The EAA was created in 2011 to focus on the 15 lowest performing schools in Detroit. Sadly, the EAA failed to come close to achieving its goals before dissolving as a near universally condemned catastrophe in 2016.

The EAA education model, such as there was one, was a version of "student-centered learning," which was almost entirely computer and technology based. Students were to learn at their own pace and any direction from teachers outside of the program was met with sharp resistance. It was no accident that a computer-driven model of education resulted in substantial savings in labor costs. Computers are cheaper than teachers.

Despite EAA claims that student performance improved, an analysis of standardized test scores tell a different story. In 2014, Wayne State University Professor Thomas Pedroni analyzed Michigan Educational Assessment Program (MEAP) test scores for 2012 and 2013. Dr. Pedroni found that the "majority of EAA students failed to demonstrate even marginal progress toward proficiency on

---

[12] Chad Livengood, *DPS Debt Payments Mount to Unsustainable Levels*, Det. News, Jan. 4, 2016.

the State's MEAP exams in math and reading. . . . In reading, 58.5% showed either no progress toward proficiency (27.3%) or actual declines (31.2%)."[13] Standardized ACT test scores for EAA students declined in all four test areas between 2014 and 2015.[14] Further, in 2016, two-thirds of EAA schools ranked in the bottom five percent.[15] Michigan State University Professor David Arsen concluded: "The EAA could fairly be regarded as a train wreck of educational policy."[16]

Both Emergency Management and the EAA became recognized failures, failures that fell directly at the feet of the state. Just as with the courts, plaintiffs could find no refuge in state executive action. Ironically, the magnitude and embarrassing nature of state failures created an opportunity for political action. The Governor wanted a pathway out of having any direct responsibility for education in Detroit.

---

[13] Thomas C. Pedroni, *MEAP Cohort Data Reveal Stagnation and Decline in EEA Student Test Achievement*, *Detroit Data and Democracy Project*, Mar. 3, 2014.

[14] College of Education Council, Eastern Michigan University, Memorandum, *Review of EMU's Interlocal Agreement with the School District of the City of Detroit* 3, Dec. 2, 2015.

[15] April Van Buren, *After Six Years, Education Achievement Authority Leaves Behind Lackluster Legacy*, Michigan Radio, June 26, 2017.

[16] *Id.*

### 3. The State Legislature Rejected Core Reforms That Would Have Addressed Structural Problems of School Finance, Choice and Governance.

In 2015, the bipartisan Coalition for the Future of Detroit Schoolchildren brought a comprehensive package of proposals to Michigan's legislature to remedy past harms to Detroit's educational landscape and to begin the process of building a workable system for Detroit's youth.[17] While the proposed reforms addressed many issues, its most critical provision was a so-called Detroit Education Commission (DEC). The DEC was intended to get to the root causes of the dysfunctional school finance, choice and governance policies by providing greater coherence in the opening and closing of schools in the city. Only by rationalizing this process could the entire school system be stabilized and the downward financial and educational spiral addressed.

The Coalition package had the support of the Governor, because the combined set of reforms would also lead to a transition out of Emergency Management and end the failed EAA experiment. The State Senate passed provisions embodying most of the Coalition recommendations which included the

---

[17] Coalition for the Future of Detroit Schoolchildren, *The Choice Is Ours* (2015).

DEC. Problems arose in the State House of Representatives. The House removed several important reforms, including the DEC.[18]

It is no accident that Michigan has the most aggressive choice and charter school system in the country. Michigan is also home to one of the most powerful charter school lobbies in the country. There was no way that the State House (or the charter school lobby) was going to pass a package restricting any aspect of school choice or rationalizing the opening and closing of charter schools in Detroit. "House and Senate Republicans and charter school advocates were adamantly opposed to the Detroit Education Commission and were successful in keeping that out of the final package."[19]

The newly enacted laws did not create a long-term solution for the children of Detroit because the laws did not address the structural and institutional causes that led to the financial deficit in the first place. Governance of Detroit Public Schools was returned to a democratically elected school board. In reality, however, the newly elected school board was given a ticking time bomb. With the failure to address the root problems of school finance and choice, the return of structural deficits is just a matter of time. When this happens, blame will once again be

---

[18] Kathleen Gray, *Legislature OKs $617M Detroit Public Schools Rescue Plan*, Det. Free Press, June 9, 2016.

[19] *Id*.

16

placed on the citizens of Detroit, with a racialized epithet familiar to all in Detroit: "We told you they cannot govern themselves."

State political processes in Michigan are fundamentally broken and cannot remedy the education crisis in Detroit. The reason for this failure is rooted in spatial racism. The dynamics are the same as those driving the Flint Water Crisis. State legislators can neglect the children of Flint and Detroit, because spatial racism guarantees that they are not their children.

What is happening in Detroit is a national tragedy standing by itself. Sadly, the real nature of the tragedy deepens when one acknowledges its historic roots.

**II.    The Denial of Literacy Rights to Detroit's Children Is the Latest Iteration of Cycles of Oppression Across Time, from Prohibitions Against Slaves Learning to Read, to Attacks on Schools and Teachers During Reconstruction, to the Separate and Unequal Schools Flowing from *Plessy v. Ferguson*.**

**A.    Systems of Racial Hierarchy Do Not Just End, They Reproduce Themselves Over Time.**

An honest reflection on American history reveals that race has always been central in the United States and that patterns of racial hierarchy are ubiquitous in our nation's history. Racial hierarchies mutate and transform themselves over time. Institutional changes may take place, like the abolition of chattel slavery, but if there is no comparable change within the governing belief system, the racialized hierarchy simply reproduces itself in a different form. In this manner, systems of slavery are reproduced into the new forms of oppression characteristic of Jim Crow

segregation. Understanding these patterns starts to unlock the persistent and central role race continues to play in America.

The basic denial of literacy rights for African Americans has reproduced itself in various forms of hierarchies of racial oppression throughout our history, from slavery to Reconstruction, to Jim Crow, to the regimes of spatial racism governing schools in Detroit today.

**B.    The Denial of Literacy Rights Is a Principal Mechanism in America for Political and Economic Oppression.**

**1.      Prohibitions Against Literacy Reinforced Slavery.**

The definition of "fundamental rights" is sometimes framed in terms of rights or practices "deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). If we are honest when it comes to practices steeped in American history concerning education, we are confronted with one reality. The most ancient educational practice that has existed in America is the prohibition against teaching slaves to read—the denial of literacy rights to oppressed groups.

The prevention of literacy was a key mechanism of oppression and social control exercised by white slaveholders, politicians, and citizens alike. The motivation was simple: If enslaved people gained the ability to read, they could read abolitionist literature, develop ideas about freedom, and use that knowledge to either escape, rebel, or become otherwise ungovernable. In his renowned

18

autobiography, Frederick Douglass recalled his master's reaction to finding out he was learning to read: "A n****r should know nothing but to obey his master . . . if you teach that n****r how to read, there would be no keeping him." This admonishment was revelatory for Douglass, demonstrating the power wielded by education while illuminating "the pathway from slavery to freedom."[20]

White Americans went to great lengths to prevent enslaved Africans and African Americans from reaching the kind of revelation Douglass experienced. In addition to grotesque physical punishment, statutes were enacted throughout the South forbidding the education of enslaved people. Even in the face of such fierce repression, however, enslaved Africans and African Americans persisted in their quest for literacy, education, and liberty. "The very feeling of inferiority which slavery forced upon them fathered an intense desire to rise out of their condition by means of education," W.E.B. Du Bois wrote of this great struggle.[21]

> **2.    White Vigilantes and State Actors Physically Attacked Teachers and Burned Schools During the Reconstruction Era.**

Following Emancipation, Freedmen and women led what Du Bois described as the "first great mass movement for public education at the expense of the

---

[20] Frederick Douglass, *Narrative of the Life of Frederick Douglass: An American Slave* 364, *in* Henry Louis Gates, Jr., ed*., The Classic Slave Narratives* (1987).

[21] W.E.B. Du Bois, *Black Reconstruction in America* 638 (1992).

state."[22] This yearning for freedom by formerly enslaved people undergirded the establishment of public education in this nation. These efforts during reconstruction, however, were met with direct physical violence. After a teacher in Forsyth, Georgia was murdered by white vigilantes in 1867, a group of Freedmen desperately pleaded with the Freedman's Bureau to send in federal troops for protection. "This is the second teacher that has been assaulted," the group of Freedmen wrote. "The Rebels make their brags to kill every Yankee teacher that they find."[23]

The plea of these Freedmen in rural Georgia was hardly hyperbole—the wanton violence against African American education was widespread throughout the South. As historian George Rable notes, Klansmen targeted schoolteachers for violent retribution and Black parents who sent their children to school frequently "received visits from white men eager to reinforce the nuances of the established racial order."[24]

Although infrequently understood as such, the Civil Rights Enforcement Acts of 1870 and 1871 were amongst the first federal education policies ever

---

[22] *Id*.

[23] Dorothy Sterling, ed., *The Trouble They Seen: Black People Tell the Story of Reconstruction* 297 (1976).

[24] George Rable, *But There Was No Peace: The Role of Violence in the Politics of Reconstruction* 97 (2007).

adopted. These laws represented a direct federal response to the wanton violence targeting Black attempts at uplift, including gaining basic literacy skills. In these Acts, Congress clearly delineated the powers of the federal government to intervene in situations where states or individuals either failed to protect, or actively denied the civil rights of African Americans. The 1871 Act, also known as the Ku Klux Klan Act, for the first time gave the federal government the power to prosecute individuals for conspiring to deprive citizens of their right to equal protection of the laws.[25]

Despite the passage of these groundbreaking congressional acts, African American communities continued their appeals to the federal government to intervene in this persistent rampant violence and denial of educational opportunity. In the early 1870s, African American Congressmen even fought for a national education bill. Addressing the House in 1872, Florida Congressman Josiah T. Walls argued that as "the guardian of the liberties of all its subjects," the federal government was responsible for guaranteeing the educational rights of African Americans.[26] Without federal intervention, Walls suggested, there was little chance

---

[25] For thorough analyses of the Enforcement Acts and federal responses to Klan violence targeted at Black uplift, see Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877*, at 454-459 (2002), and Lou Falkner Williams, *The Great South Carolina Ku Klux Klan Trials, 1871-1872* (2004).

[26] Sterling, *supra* note 23, at 304.

that African Americans would have access to education "under the present condition of society."[27] His warning proved prescient then, and carries a familiar ring today across nearly 150 years. As historian Dorothy Sterling notes, however, the bill, along with several others to allow federal intervention in public education, failed to pass "in part because its opponents feared that nationally supported education would mean integrated schools."[28]

Senator and Emancipation champion Charles Sumner understood the connection between education and freedom for Blacks and Whites. "The New England system of common schools is a part of the republican form of government as understood by framers of the Constitution."[29] Sumner also saw the connection between education and civil rights, seeking to wrought support for education into the regime of post-war civil rights protection. This great opportunity for codifying federal protections for African American educational rights was lost, however, when Sumner's Civil Rights Act of 1875 passed months after his death with its provision for schools stripped away.[30]

---

[27] *Id.*

[28] *Id.*; *see also* Foner, *supra* note 25, at 452.

[29] David Herbert Donald, *Charles Sumner, Parts I & II* 426 (1996).

[30] Foner, *supra* note 25, at 556.

**3. Post-Reconstruction, the Denial of Literacy Rights Became a Matter of Affirmative State Policy, Not Just Vigilante Violence.**

Remarkably, despite direct assaults of physical violence, systems of education for African Americans began to take root during and after Reconstruction. While threats of physical violence remained, the most serious attacks on African American systems of education and basic literacy rights stared coming from instrumentalities of state and local government, reinforced by state and federal courts. This was part of a larger pattern of oppression. As the balance of political power in the nation swung back toward the South, the Civil War constitutional amendments were increasingly interpreted to provide shelter to the racist policies and actions of southern whites instead of being used to protect the civil rights of African American citizens.

In terms of the social reproduction of racial hierarchies denying literacy rights to African Americans, two Supreme Court cases played critical roles: *Plessy v. Ferguson*, 163 U.S. 537 (1896), and *Cumming v. School Board of Richmond County, Georgia,* 175 U.S. 528 (1899). The story of *Plessy* is well known. While not addressing education directly, *Plessy* ushered in a regime of separate and unequal, if often non-existent systems of education for African Americans. The

23

story of *Cumming* is less well known, but critically important. *Cumming* has been described as the "leading case on educational discrimination for four decades."[31]

*Cumming* serves as a cautionary tale for the present case of *Gary B. v. Snyder*. The City of Augusta, Georgia, lies in Richmond County. After years of demands from the Black community, the Richmond County School Board approved the establishment Ware High in Augusta in 1880. This might not sound like a big deal, but Ware was the only Black high school in the entire state of Georgia and one of only four high schools in all the eleven former Confederate states.[32] "Ware High became a solid academic secondary school, a source of pride and an avenue of mobility for Augusta's striving black community."[33]

In 1897, the Richmond County School Board closed Ware High, while continuing to fund public high schools for its white citizens. Ware supporters mounted an impressive legal battle to save the school, alleging numerous constitutional violations, including the denial of equal protection under the law. Plaintiffs presented further evidence of racially disparate school buildings, funding, and teacher salaries, seeking to enjoin local officials from expending tax money for

---

[31] J. Morgan Kousser, *Separate but not Equal: The Supreme Court's First Decision on Racial Discrimination in Schools*, 46 J.S. Hist. 17, 17-18 (1980).

[32] James D. Anderson, *The Education of Blacks in the South, 1860-1935*, at 188 (1988).

[33] *Id*. at 192.

white high schools until Ware High was reopened. While winning an initial victory in Superior Court, they lost in the Georgia Supreme Court before appealing to the U.S. Supreme Court.

*Cumming* was the first education case to challenge *Plessy*'s separate but equal rule in a manner presaging *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954). The Court slammed the door on all the plaintiffs' claims. In reasoning resembling the numerous obstacles that would later be layered on future constitutional claimants, the Court extinguished every constitutional hope that may have lingered for African American schools from the Reconstruction Era. *Cumming*, 175 U.S. at 542-44. So dramatic was the implosion of constitutional rights embodied in the opinion, historian James Anderson concluded that the "U.S. Supreme Court ruling in *Cumming* transformed the promise of equal protection into a 'derisive taunt.'"[34] The Court's "peculiar ruling meant that southern school boards did not have to offer public secondary education to black youth."[35]

*Cumming* was decided on the eve of yet another cycle of racial oppression, denying basic literacy rights to African Americans in the new era of Jim Crow. Federal courts did nothing to stop it or to uphold fundamental constitutional promises. Instead, federal courts became complicit in the crime. "The case gave the

---

[34] *Id*.

[35] *Id*.

southern and other states a green light to heighten discrimination in publicly funded activities and discouraged black litigants from seeking redress in federal courts."[36] Generations of Black children were denied basic literacy and an education. "Blacks in the rural South were excluded from the revolution in public secondary education that characterized the nation and the region during the period 1880 to 1935."[37]

African Americans in the city of Augusta would have to wait until 1945 for another four year secondary school to be opened for their children.[38] The loss of education was also the loss of political power. In the wake of *Cumming*, "Augusta also witnessed a dramatic collapse of the limited political power blacks had enjoined since Reconstruction."[39]

### C. Oppression Has Moved from Systems of Jim Crow Segregation in the South to Systems of Spatial Racism in the North and from *Cumming* to *Gary B.*

Racism has always been a national problem, but with the influx of African Americans in the Great Migration, often fleeing the oppressive segregation of Jim Crow, racism started to etch new patterns on the geographic and social landscape

---

[36] Kousser, *supra* note 31, at 42-43.

[37] Anderson, *supra* note 32, at 186.

[38] *Id.* at 193.

[39] Kousser, *supra* note 31, at 43.

of the North. Though removed from *Cumming* by over a century, the current state of public education in Detroit is intrinsically linked to this long history of denials of basic literacy rights. *Cumming* has come to Detroit in the form of *Gary B.*

*Brown* was later to perceive the injustices of *Plessy* and seek a corrective path. But injustices are a moving target. One system of racial hierarchy mutates and transforms itself into another. Southern racism was predominantly a form of social segregation. Northern racism takes on significant geographic dimensions. There is an old saying that captures this sentiment: "In the South, you can be close, but you cannot be equal, while in the North, you can be equal, but you cannot be close." Racism in the north assumes the form of spatial racism.

In *Milliken*, the Court could not perceive the full dynamics of spatial racism at play, nor their long-term implications. *Gary B.* is the child of *Milliken*. Amicus hopes that a fuller appreciation of spatial racism can provide a deeper understanding of the continuity of systems of racial hierarchies and the historic lineage of the denial of rights to literacy taking place in Detroit. And understanding should invite action.

After *Cumming*, African American children in Augusta, Georgia, were denied the basics of a secondary education for nearly a half century. It took almost six decades for the Court in *Brown* to perceive and reverse the injustices in *Plessy*. Decisions have consequences. The educational system in Detroit is fundamentally

27

broken as a matter of failed state policies and dysfunctional political processes.

The fate of generations of Detroit children are at stake.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824

Counsel for Amici Curiae

This brief principally drafted by:

Peter J. Hammer, Professor of Law*
471 W. Palmer St.
Detroit, MI 48202
(313) 577-0830

* Professor Hammer gratefully
acknowledges the research assistance of
Peter Blackmer, Ph.D.

Dated: November 26, 2018

29

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Rule 29(a)(4) and (5) of the Federal Rules of Appellate Procedure because it has been prepared using 14-point Times New Roman font and, according to the word-count feature of Microsoft Word, it contains 5816 words, excluding the parts of the brief exempted by Rule 32(f).

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund
  of Michigan

Dated: November 26, 2018

30

**CERTIFICATE OF SERVICE**

I hereby certify that on November 26, 2018, I caused this brief to be electronically filed with the Clerk of the Court using the ECF filing system, which will send notifications to all counsel of record.

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund
  of Michigan

31

**APPENDIX ON SPATIAL RACISM**



Map 1: Neighborhood Opportunity Map for the Detroit Metro Region



Map 2: Neighborhood Opportunity Map and 2000 Distribution of African American Population (1 Green Dot = 200 African American Residents)